1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

9
10
11

JOHN LESLIE DAVIS, SR.,

Civil No.   14cv0560-GPC (JLB)

12

                                    Petitioner,

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF FIRST AMENDED PETITION FOR A WRIT OF HABEAS CORPUS**

13

vs.

14

DAVID LONG, Warden,

15

                                    Respondent.

16
17

        This Report and Recommendation is submitted to United States District Judge Gonzalo

18

P. Curiel pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States

19

District Court for the Southern District of California.

20

## I.

21

## FEDERAL PROCEEDINGS

22

        John Leslie Davis Sr. (hereinafter "Petitioner") is a California prisoner proceeding pro

23

se and in forma pauperis with a First Amended Petition for a Writ of Habeas Corpus pursuant

24

to 28 U.S.C. § 2254. (ECF No. 13.) Petitioner challenges his San Diego County Superior Court

25

convictions on two counts of robbery, for which he was sentenced to two consecutive terms of

26

25 years-to-life. (First Amended Petition ["FAP"] [ECF No. 13] at 2.) He alleges in Claim 1

27

here, as he did on direct appeal, that insufficient evidence exists to support the convictions

28

because the only persuasive evidence linking him to the robbery, the DNA evidence, lacks

probative value.  (FAP [ECF No. 13] at 3.[1])  He alleges in Claims 2-75, which he raised in six pro se state habeas petitions, that his federal Constitutional rights were violated by numerous instances of prosecutorial misconduct, trial court error, and ineffective assistance of counsel. (Id. at 3-23.)

Respondent has filed an Answer with an attached Memorandum of Points and Authorities in Support, and has lodged portions of the state court record.  (ECF Nos. 36-37, 45.)  Respondent contends habeas relief is unavailable because the state court adjudication of Claim 1 is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and because the remaining claims are unexhausted, procedurally defaulted, and without merit. (Memorandum of P&A in Support of Answer ["Ans. Mem."] [ECF 36-1] at 12-23.)  Petitioner has filed a Traverse (ECF No. 40), a Supplemental Traverse (ECF No. 42), and a Reply (captioned Demand To Establish Respondent's Veracity To Petitioner's Insufficient Evidence Claim In His Answer).  (ECF No. 47).

For the following reasons, the Court finds the exhaustion requirement has been satisfied as to all claims presented, and that Respondent has failed to carry the burden of showing any claim is procedurally defaulted.  The Court finds habeas relief is unavailable as to the 52 claims which were adjudicated on the merits in state court because that adjudication is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The Court finds that relief is unavailable as to the remaining claims under a de novo review because they rely on allegations which do not establish a federal Constitutional violation.  The Court therefore **RECOMMENDS** the First Amended Petition be **DENIED**.

## II.

## STATE PROCEEDINGS

In a two-count Amended Information filed in the San Diego County Superior Court on May 9, 2011, Petitioner was charged with two counts of robbery in violation of California Penal

---

[1] Citations to the pleadings and lodgments are to pages assigned by the Court's Electronic Case Filing ("ECF") system where available.

1   Code section 211.  (Lodgment No. 1, Clerk's Tr. ["CT"] [ECF No. 37-1] at 5-6.)   The

2   information contained sentence enhancement allegations that Petitioner had six prior serious

3   felony convictions which constituted strikes within the meaning of California's Three Strikes

4   law.  (CT [ECF No. 37-1] at 7.)

5        A jury found Petitioner guilty on both counts on May 18, 2011, and he admitted he had

6   suffered the six prior strike convictions.  (CT [ECF No. 37-1] at 93-94, 189.)  On June 28, 2011,

7   a defense motion to strike the prior convictions was denied, and Petitioner was sentenced to two

8   consecutive terms of 25 years-to-life in state prison.  (CT [ECF No. 37-1] at 190.)

9        On November 14, 2011, Petitioner filed an appeal ("Direct Appeal") presenting Claim

10  1 raised here, along with a claim challenging the denial of the motion to strike the prior

11  convictions.  (Lodgment Nos. 3-4 [ECF Nos. 37-6, 37-7].)   The appellate court affirmed.

12  (Lodgment No. 5 [ECF No. 37-8], People v. Davis, No. D060030, slip op. (Cal.Ct.App., Aug.

13  23, 2012).  On September 10, 2012, Petitioner filed a petition for review in the state supreme

14  court presenting the same claims.  (Lodgment No. 6 [ECF No. 37-9].)  That petition was denied

15  by an order which stated: "The petition for review is denied."  (Lodgment No. 7 [ECF No. 37-

16  10], People v. Davis, No. S205298, order at 1 (Cal. Oct. 31, 2012).)

17       On May 9, 2012, while his Direct Appeal was pending in the appellate court, Petitioner

18  filed a habeas petition in the state supreme court ("First State Supreme Court Habeas")

19  presenting 54 of the claims raised here.  (Lodgment No. 16 [ECF No. 37-21].)  That petition was

20  denied on August 8, 2012, prior to the appellate court ruling on the Direct Appeal, with an order

21  which stated: "The petition for writ of habeas corpus is denied.  (See *People v. Duvall* (1995)

22  9 Cal.4th 464, 474; *In re Swain* (1949) 34 Cal.2d 300, 304; *In re Dixon* (1953) 41 Cal.2d 756,

23  759; *In re Lindley* (1947) 29 Cal.2d 709, 723.)"  (Lodgment No. 17 [ECF No. 37-22], In re

24  Davis, No. S202405, order at 1 (Cal. Aug. 8, 2012).)

25       On October 2, 2012, while the Direct Appeal was pending in the state supreme court,

26  Petitioner filed a habeas petition in the trial court ("First Trial Court Habeas") presenting 48 of

27  the claims raised here.  (Lodgment No. 8 [ECF No. 37-11].)   The petition was denied on

28  November 14, 2012, on the basis the claims were vague, unsupported by documentation or legal

authority, and failed to state a prima facie case for relief.  (Lodgment No. 9 [ECF No. 37-12], In re Davis, HCN1251, order at 3-4 (Cal.Sup.Ct. Nov. 14, 2012).)

On April 3, 2013, about five months after Direct Appeal ended, Petitioner filed a second habeas petition in the trial court ("Second Trial Court Habeas") presenting 52 of the claims presented here.  (Lodgment No. 10 [ECF No. 37-13].)  That petition was denied on the basis that the claims were or could have been raised in the First Trial Court Habeas petition, and because they failed to present a prima facie case for relief.  (Lodgment No. 11 [ECF No. 37-15], In re Davis, No. HCN1251, order at 1-2 (Cal.Sup.Ct. May 24, 2013).)

On May 9, 2013, Petitioner filed a second habeas petition in the California Supreme Court ("Second State Supreme Court Habeas") presenting 21 of the claims raised here.  (Supplemental Lodgment No. 1 [ECF No. 45-1].)  That petition was denied with an order which stated: "The petition for writ of habeas corpus is denied.  (See *In re Clark* (1993) 5 Cal.4th 750, 767-769; *People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Waltreus* (1965) 62 Cal.2d 218, 225; *In re Dixon* (1953) 41 Cal.2d 756, 759; *In re Swain* (1949) 34 Cal.2d 300, 304; *In re Lindley* (1947) 29 Cal.2d 709, 723; *In re Miller* (1941) 17 Cal.2d 734, 735.)  [¶]  Werdegar, J., was absent and did not participate." (Supplemental Lodgment No. 2 [ECF No. 45-2], In re Davis, No. S210668, order at 1 (Cal. July 31, 2013).)

On June 28, 2013, Petitioner filed a habeas petition in the state appellate court ("First State Appellate Court Habeas") presenting the same 52 claims raised in the Second Trial Court Habeas petition.  (Lodgment No. 12 [ECF Nos 37-16, 37-17].)  The petition was denied because the allegations of ineffective assistance of counsel were insufficient to warrant relief under Strickland v. Washington, 466 U.S. 668, 687 (1984), and the remaining claims, which could have been raised on direct appeal, relied on conclusory allegations which, even if taken as true, did not demonstrate Petitioner was prejudiced by any alleged error.  (Lodgment No. 13 [ECF No. 37-18], In re Davis, No. D064132, order at 1-2 (Cal.Ct.App. Aug. 13, 2013.)

On September 25, 2013, Petitioner filed a petition for a writ of error corum vobis in the state appellate court challenging the admissibility of the DNA evidence.  (Lodgment No. 14 [ECF No. 37-19].)  That petition was denied because Petitioner had not set forth a prima facie

1   case for relief.  (Lodgment No. 15 [ECF No. 37-20], <u>Davis v. Sup. Ct.</u>, No. D064629, order at

2   2 (Cal.App.Ct. Oct. 16, 2013.)

3        On September 30, 2013, Petitioner filed his third habeas petition in the state supreme

4   court ("Third State Supreme Court Habeas"), his sixth state habeas petition, presenting the same

5   52 claims raised in the First State Appellate Court Habeas plus 3 additional claims.  (Lodgment

6   Nos. 18-21 [ECF Nos. 37-23 through 37-28].)  That petition was denied with an order which

7   stated: "The petition for writ of habeas corpus is denied.  (See *In re Clark* (1993) 5 Cal.4th 750,

8   767-769.)"  (Lodgment No. 22 [ECF No. 37-29], <u>In re Davis</u>, No. S213698, order at 1 (Cal. Jan.

9   21, 2014).)

10                                          **III.**

11                          **TRIAL COURT PROCEEDINGS**

12        At Petitioner's trial, Gaylene Taylor, the manager of Mulloy's Fine Jewelry store in

13   Carlsbad, California, testified that the most vulnerable time for a robbery in the jewelry business

14   is during the daily opening, so her opening routine includes observing her surroundings as she

15   approaches and unlocks the store, and always being accompanied by a partner.  (Lodgment No.

16   2, Reporter's Tr. ["RT"][2] at 77-78.)  On the morning of October 21, 2009, she and coworker

17   Mary Hyde arrived together at 9:00 a.m., an hour before opening.  (RT 78-79.)  They entered the

18   store together and placed panic buttons around their necks, which summon police if pressed.

19   (RT 79-80.)  Hyde waited by the front door as Taylor walked through the store to check for

20   anyone hiding inside; Taylor looked inside the two bathrooms, the steam room where jewelry

21   is cleaned, and the office; the bathroom doors are left open at night to safely clear them each

22   morning, and she closed the doors after checking them.  (RT 81-83, 100.)  After Taylor made

23   sure the store was clear, she switched off the alarm system, and Hyde locked them both inside

24   by placing a bicycle lock on the steel security gate on the front door.  (RT 82-83.)

25        Taylor opened the safe, removed merchandise for display, and was cleaning jewelry in

26   the steam room when, about 9:15 a.m., she turned around and saw a man pointing a gun at her.

27

28   _____

     [2]  The Reporter's Transcript, Lodgment No. 2, is found at ECF Nos. 37-2 through 37-5.

(RT 89-90.)  The man was wearing a dark outfit with his face covered by a mask.  (RT 93.)

Taylor said she had excellent hearing and could not understand where the man came from.  (RT 94.)  Taylor said the man grabbed her arm and tried to pull her toward the front of the store, that he said "come" in a "very gentle" and "very respectful" tone, and that she screamed and refused to go with him because she knew Hyde was in the front and she thought they would be safer apart.  (RT 93, 135.)  Taylor dropped to the floor and screamed: "Just take whatever you want. I don't care.  Whatever you want," and repeatedly screamed: "Just don't hurt us."  (RT 94.) Surveillance camera videotapes were shown to the jury and showed a man, a little taller than Taylor, who is five-feet four-inches tall, opening the door of the women's bathroom and confronting Taylor; he is later seen with a 24-inch white bucket used to store jewelry in the safe. (RT 103.)  After Taylor dropped to the ground she heard the man tell Hyde: "Ma'am, get down." (RT 112.)  Taylor heard the man drop something in the women's bathroom, heard footsteps on the roof, checked on Hyde and found she was calling 911, and they unlocked the front security gate and went outside where the police were waiting.  (RT 95, 112-14.)  She told the police that day that she thought the robber had an Hispanic accent.  (RT 127-28.)

Immediately after the robbery, Taylor noticed that some of the store's jewelry was on the floor of the women's bathroom and that the vanity sink was broken, although it had been undamaged when she looked into the bathroom earlier.  (RT 109-10.)  A few days after the robbery, Taylor noticed ceiling dust on a printer in the back office and holes in the ceiling tiles. (RT 107-08, 135-36.)  Taylor said she had called the police on September 10, 2009, about seven weeks before the robbery, and reported that two suspicious men who had taken photographs of the store the previous week were inside the store looking around.  (RT 121-23.)  She also said she called the police again later that day and reported that one of those persons, an African-American man, was trying to force his way inside the store.  (RT 123.)

Mary Hyde testified that on the morning of October 21, 2009, she followed her ususal routine of opening Mulloy's Fine Jewelry store by meeting her coworker Gaylene Taylor about a block from the store.  (RT 182-83.)  Hyde stayed by the front door with an alarm in her hand while Taylor cleared the store.  (RT 184.)  When Taylor gave the all clear signal, Hyde went to

the back of the store and began checking emails and messages while Taylor opened the vault and began setting up merchandise. (RT 186-87.) Taylor was in the back room cleaning jewelry while Hyde was removing covers from display cases, when Hyde heard Taylor emit five "blood curdling" screams, with "absolute fear in her scream," and Hyde ran toward the back of the store. (RT 187-89.) She saw a man holding Taylor by her arm and pointing a gun at her, and saw Taylor, who was screaming, dive to the floor. (RT 190.) The man was wearing dark clothing from head to toe, with a hooded sweatshirt, a mask on his face, gloves, and a jacket zipped all the way up so that she could not see any part of his skin. (Id.) The man came around from the back to where Hyde was crouching, pointed the gun at her, and said in a very soft voice: "Get down on the floor, Ma'am," and she dropped to the floor. (RT 191.) Hyde said she initially described the voice to the police as maybe Hispanic because it was soft and she was terrified. (Id.) She said the man was very slim, and although he never stood up completely she assumed he was about five-feet eight-inches tall.[3] (RT 195.)

As she lay on the ground, Hyde could hear Taylor praying, the man rifling through the safe, and other noises which moved from the vault area into the bathroom that, "in retrospect we know what it was, as he took the tray out of the vault and into the bathroom to take it out." (RT 194.) Hyde heard footsteps on the roof and Taylor asked her if she was alright, at which point they realized the man was no longer in the store so they called 911 and went outside. (RT 196-97.) Hyde said she noticed ceiling tile dust on a printer and a copy machine along the wall in front of the bathroom about two days before the robbery, and looked up but did not see anything or think anything of it at the time. (RT 197-98.) After the robbery she noticed a hole about the size of a quarter in the ceiling tile directly in front of the vault. (RT 199-200.)

Trevor Winters, a retired Carlsbad police officer, testified that on October 21, 2009, he responded at approximately 9:17 a.m. with other officers to a silent alarm at Mulloy's Fine Jewelry store, and set up a perimeter around the building. (RT 152-54.) The front and back of building were covered, the employees were removed, a helicopter conducted a fly over, and the

---

[3] Petitioner is identified in the probation report as African-American, five-feet, ten-inches tall, weighing 170 pounds, and 51 years old at the time of the robbery. (CT [ECF No. 37-1] at 95.)

officers entered the store.  (RT 154-55.)  Officer Winters observed that the sink in the women's bathroom was broken and on the floor, the ceiling hatch in that bathroom was open, and jewelry was lying on the floor.  (RT 156-57.)  There was a hole in the roof which Winters secured until the evidence technicians arrived; next to the hole he saw white jewelry buckets from the store and a purple latex glove.  (RT 157-59.)  He looked into the crawlspace between the roof and the drop ceiling and saw a black paintball mask, a black gun, a backpack, and jewelry strewn about.  (RT 160.)  He also saw a damaged mount for a motion detector that appeared to have been removed by being kicked or pried off the wall.  (RT 161.)

Officer Winters said the robber appeared to be wearing light-colored latex gloves on the video surveillance tapes, and that he found a pair of white latex gloves about 100 yards north of and behind the store underneath a dumpster where a passerby had reported seeing a suspiciously-placed pair of gloves.  (RT 162-65.)  He testified on cross-examination, over a hearsay objection and with an admonishment to the jury not to consider the testimony for the truth of the matter as to whether any suspects had been seen in the area but only in the context of the police investigatory actions, that he had been informed that city employees had reported to the police they had seen suspicious people travel from the jewelry store past the dumpster, had been told that two Hispanic males, about the same height as Taylor had described the robber, had been seen in the area with backpacks acting suspiciously and attempting to hide behind trees, and had been told by Taylor and Hyde that the robber spoke with an Hispanic accent.  (RT 168-77.)  He testified that there had been no reports of an African-American man seen in the area around the time of the robbery, and said Petitioner was not the African-American man who Taylor had reported at the store seven weeks before the robbery.  (RT 173-76.)

Randell Shultz, an evidence technician with the Carlsbad Police Department, testified that a broken sink and jewelry were lying on the floor of the women's bathroom, and a hatch was open in the bathroom ceiling which provided access to a crawlspace between the roof and the ceiling.  (RT 209-13, 220.)  There was a built-in fire evacuation ladder on the outside back wall of the store leading up to the roof which only could be used with some assistance, such as a vehicle to stand on; there was a hole in the roof, and a parapet surrounding the roof which would

have obscured the view of anyone on the ground from seeing someone cutting the hole.  (RT 214-15.)  Next to the hole lay the removed roofing material, along with packaging material for jewelry.  (RT 216.)  It appeared to him that a circular saw had been used to cut a square hole, but it did not cut all the way through, as the plywood was jagged and appeared to have been ripped.  (RT 216-17.)  Inside the crawlspace Shultz saw a handgun, a backpack, a mask of the type used by people who shoot non-lethal weapons such as paintball guns, drywall debris, and jewelry items, including display mountings.  (RT 218-19.)  The day after the robbery, Shultz was given the fingertip of a purple latex glove found by the store owner underneath attic insulation in the crawlspace.  (RT 224-25.)  Shultz said that in some angles on the surveillance videotapes the robber's gloves appear to be purple, but not in other angles.  (RT 226.)

Christopher McDonough, a retired Carlsbad robbery detective, testified that in 1993 he investigated a series of three rooftop-entry crimes which included a robbery of a Pep Boys store on February 15, a burglary of the Stevens Gun store on March 1, and a robbery of a Checkmate check cashing store on March 9.  (RT 248.)  The check cashing store robber entered through the roof, waited for employees to arrive in the morning, and confronted them with a handgun after they disabled the alarm.  (RT 249.)  The robber wore dark clothing and gloves, came out of a bathroom, grabbed a female employee by the arm, had her lay on the floor, and tied her hands behind her back.  (Id.)  The robber left items of clothing and an air-soft pistol behind.  (RT 250.)  The bathroom in the check cashing store and the crawlspace between the roof and the ceiling were not covered by motion detectors.  (RT 251.)

The Pep Boys robber entered through the roof, climbed into the area between the roof and the ceiling, and entered the store through the back tire rack area while evading the alarm system.  (RT 252.)  The robber used an air-soft pistol and left behind gloves and clothing.  (Id.)  The Stevens Gun store burglary involved the same type of roof-top entry.  (RT 251.)  Detective McDonough testified that in his 21 years of experience he found these types of robberies very unusual and the modus operandi very unique, although on cross-examination he said such commercial burglaries were "a little bit more common."  (RT 251-54, 269-70, 288.)

Detective McDonough testified that Petitioner had waived his <u>Miranda</u> rights during the investigation of those three 1993 rooftop-entry crimes and spoke with the police during the investigation.  (RT 253-55, 273.)  The police had no information that Petitioner was involved in those crimes until Petitioner volunteered information, although he initially blamed the crimes on an unnamed Hispanic person.  (RT 278, 291.)  With respect to the Stevens Gun burglary, Petitioner said someone approached him and asked if he would break into the gun store for them.  (RT 255.)  Petitioner said he cased the store by observing the layout of the alarm system and found that the alarm would not trip if he stayed behind the counter, and passed that information to the people who had approached him.  (RT 255, 257.)  Petitioner said he climbed on the roof and peeled off roofing materials using a pair of vice grips and a screwdriver, but he never went inside, as his job was just to open the hole.  (RT 256.)

With respect to the Pep Boys store, Petitioner told Detective McDonough that he cased the store and watched to see when the manager arrived in the morning.  (RT 257-58.)  Petitioner said he entered through a hole in the roof, climbed along the drop ceiling, lifted ceiling tiles at various locations to locate alarms and check inside the business, dropped down into the tire rack area, tripped an alarm, crawled back out, and waited across the street where he observed the police response.  (RT 258.)  Petitioner said he entered through the hole in the roof again the following morning, waited for the employees to arrive, dropped down in the tire rack area, and confronted the manager with a gun.  (RT 259.)  He ordered the manager to open the safe, grabbed money from the safe, took the manager's keys, and attempted to exit through the front door, but when it would not open he broke a window and escaped.  (RT 259-60.)  Petitioner left the gun, clothing and a tote bag behind at the store, and he told Detective McDonough that "he always did that."  (RT 260-62.)  The robber wore a mesh bag over his head but was identified by witnesses as African-American.  (RT 288.)

With respect to the robbery of the Checkmate check cashing store, Petitioner told Detective McDonough that he cased the business for a few days prior to the robbery, which included going inside, and on the morning of the robbery gained entry through a hole in the roof which he made by removing roofing materials, dropped down into the area between the roof and

ceiling, where he observed that the alarm system was not functioning, and then dropped down into a bathroom. (RT 262-64.) He had arrived a couple of hours before the employees, so he went back up through the roof and smoked a cigarette. (RT 263-64.) Petitioner said he listened for an employee to arrive and disable the alarm system, then confronted her with a weapon, demanded the store's money, and fled out the front door. (RT 264-65.) Witnesses identified the robber as African-American. (RT 286.) Petitioner told Detective McDonough that he had a background in construction, in particular building framing, and was familiar with blueprints. (RT 265-66.) Petitioner also said he spoke Spanish, and was familiar with security systems through his work in the construction trades. (RT 266-67.)

John Postelnek testified that he works at the Gems and Loans Jewelry Exchange in Vista, California, and is a trained diamond grader. (RT 292-94.) His job is to give opinions on the quality of diamonds in order to determine what to pay if they buy or sell, or how much to loan if one is pawned. (RT 293-94.) On November 12, 2009, Petitioner came into the store with a loose diamond to sell, which Postelnek said was unusual because most of the diamonds brought in are mounted in rings or necklaces. (RT 294-96.) The diamond was a marquis shape, about half a carat, with a VS1 clarity and F color, which made it a very rare, high quality stone. (RT 296-98.) Postelnek offered Petitioner $350 for the diamond, about 20 percent of its value, the usual percentage rate to buy, but Petitioner did not wish to sell at that price, so he pawned it for $175, about 10 percent of its value, the usual rate for a pawn. (RT 306-07.) Petitioner filled out a pawn slip, which required his signature, driver's license information, and thumb print, a copy of which was sent to the police in the routine course of business. (RT 298-301.)

Cathy Chang, a DNA Criminalist with the San Diego County Sheriff's Crime Lab, testified that she developed DNA profiles from the gun, mask, purple latex glove fingertip, and pair of white latex gloves recovered from the Mulloy's Fine Jewelry store robbery. (RT 326-33.) She recovered a mixture of DNA from at least two individuals on the mask and the gun, a major contributor and a minor contributor, and entered the major contributor's profile into a DNA database, but did not do so for the gloves or glove fingertip because the profiles were insufficient. (RT 333-35.) After she was notified of a match in the database, she procured a

DNA sample from Petitioner and compared it to the DNA profiles recovered from all four items. (RT 334-35.)  The purple glove fingertip did not contain sufficient DNA to check for a match, and Petitioner was excluded as a contributor for the white latex gloves. (RT 336-37.)  Petitioner was a match for the mask and gun with a probability of one in 85 quintillion that the DNA would match Petitioner and another person randomly selected from the African-American population. (RT 337-38.)  She said the frequency estimates from the Hispanic or Caucasian populations are similar, as variation between the groups is insignificant.  (Id.)

Patrick Preston, the lead Carlsbad police detective assigned to investigate the robbery, testified that he examined the surveillance video carefully and noticed the robber appeared to have a purple glove on his left hand before he goes around a corner, appears to have a white glove on that hand when he comes back, and appears to have a darker, black glove on his right hand. (RT 356-58.)  After being informed that the DNA found on the mask and pistol matched Petitioner's DNA in the DNA database, he ran a check on local pawnshops and found that Petitioner had pawned a half-carat marquis diamond on November 12, 2009.  (RT 363-64.)

Officer Preston obtained Petitioner's home address in Oceanside and began a surveillance of that address.  (RT 365.)  Petitioner was observed driving a red, 1998 GMC Sierra pickup registered to Socorro Guadalupe Hernandez, the co-owner of the house in which Petitioner resided.  (RT 366.)  Officer Preston contacted the owner of the jewelry store, Phil Mulloy, who said that one of the stolen items was a ring with two, half-carat marquis diamonds with the same grade as the pawned diamond.  (RT 367.)  Officer Preston obtained a search warrant for the pickup truck and house, and seized a functioning headband flashlight, a pair of black gloves, and a jeweler's coin pouch from the pickup truck.  (RT 368-70.)  The pawnshop receipt was found in Petitioner's wallet, and a sample of his DNA was taken.  (RT 371-72.)  Inside a safe in the house, which was forced open after Petitioner declined to give the combination, were numerous pieces of jewelry, none of which matched any item taken in the robbery, and which Mr. Mulloy said was inferior merchandise he would not stock in his store.  (RT 373-74.)

On cross-examination by defense counsel, Officer Preston testified, without a hearsay objection and without the prior admonishment to the jury not to consider Officer Winters'

testimony for the truth of the matter, that a man named Bleeth who worked next to Mulloy's jewelry store had reported that the night before the robbery he saw two suspicious looking Hispanic males hanging out in the area behind the jewelry store wearing backpacks and hiding behind trees or bushes, and that moments after the robbery two city workers saw two Hispanic men in the alley behind the jewelry store acting suspiciously, wearing backpacks and hiding behind trees or bushes. (RT 389-90.) Officer Preston interviewed Bleeth and the city workers, but they provided insufficient information to identify the two Hispanic men or to follow up on that aspect of the investigation. (RT 390-91.) He said the loss reported by Mr. Mulloy was about $84,000, but the diamond Petitioner pawned for $175 was the only piece of jewelry taken in the robbery ever traced to Petitioner. (RT 392.) He also said he was told that because there was no laser inscription on the pawned diamond, and it was not mounted, it could not be conclusively identified as one of the diamonds from the robbery, and that removing a stone from a ring is therefore an effective way to avoid identification of the stone. (RT 393, 398.)

Phil Mulloy, the owner of the jewelry store, testified that he had once been a general contractor, and inspected his roof often to ensure proper maintenance. (RT 401-05.) He said there was a five-foot parapet around the roof which would have concealed anyone cutting a hole, that someone familiar with the construction business would recognize that a bathroom was directly beneath the roof vent near the hole, and that whoever made the hole "had to really know what they were doing to create a hole like that." (RT 405-09.) He said holes had been cut in the drywall partitions in the crawlspace to allow for access to different areas above the store, holes had been cut in the ceiling tiles, including one above the safe where someone could watch it being opened, that he found a purple glove fingertip while replacing insulation covering the ceiling tiles, and that an alarm technician had told him that a motion sensor in the crawlspace directly above the women's bathroom had been disconnected. (RT 403, 413-22.) He said the crawlspace is pitch black without any light, and the motion detector near the bathroom access panel is turned off during the day. (RT 424-25.) The People rested.

//

//

1    The defense called Socorro Hernandez, who testified that she and Petitioner were living

2    together and purchasing the house they were living in when Petitioner was arrested.  (RT 487.)

3    She said the safe in the house belonged to her, that Petitioner did not know the combination, and

4    the items in the safe belonged to her deceased husband.  (RT 487-88.)  She testified that around

5    the time Petitioner was arrested she did not see him with jewelry or large amounts of money, and

6    did not see him buy anything expensive.  (RT 489.)  She also said Petitioner had been in perfect

7    physical condition, lifting weights and exercising, until he injured his arm in bicycle crash two

8    or three years earlier, which caused the muscles of one arm to atrophy and resemble the muscles

9    of a child's arm.  (RT 490-91.)  On cross-examination, she said that before Petitioner was

10   arrested he was remodeling their bathroom by himself, doing yard work and working around the

11   house carrying tools, as well as going to his regular job as a mechanic and doing side jobs fixing

12   cars and boats.  (RT 492-95.)

13   Patrick Pregler testified that he owns a boat repair facility where he employed Petitioner,

14   and that they had been friends a long time.  (RT 486-97.)  He said Petitioner is a certified

15   mechanic who does excellent work, and that they use the type of head-mounted flashlight seized

16   from Petitioner's truck in their work.  (RT 497-98.)  He said Petitioner had always stayed in

17   excellent physical condition but had hurt his arm badly in a bicycle accident.  (RT 498-99.)  He

18   had to let Petitioner go in June of 2009, due to the bad economy, but helped him get side jobs.

19   (RT 501-02.)  On cross-examination, Pregler said that after the bicycle accident Petitioner did

20   not have difficulty going up and down ladders four to fifteen-feet long into and out of boats, and

21   carrying tools and equipment weighing ten to fifty pounds.  (RT 501-02.)  The defense rested

22   and there was no rebuttal.  (RT 505.)

23   On May 18, 2011, after deliberating one full day, during which the testimony of Detective

24   McDonough, Mary Hyde and Cathy Chang were read back at the jury's request, the jury found

25   Petitioner guilty of two counts of robbery.  (RT 562-73; CT [ECF No. 37-1] at 182-86.)  On May

26   19, 2011, Petitioner admitted he had suffered six prior felony convictions which constituted

27   strikes under California's Three Strikes law.  (RT 581-83.)

28

On June 20, 2011, Petitioner filed a pro se motion for a mistrial arguing: (1) defense counsel was not prepared for trial and a continuance should have been granted; (2) evidence was withheld that his bathroom was not being remodeled during the search of his house; (3) he did not receive discovery of any reports, photographs or videos of the officers who secured the store and the roof; (4) DNA from other persons on the gun and mask, and the lack of nicotine residue on the mask, raised doubts about whether he had touched the items, as he was a heavy smoker; (5) hair and fingerprint analysis were conducted by the lab who did the DNA testing but those results were withheld; and (6) his three prior convictions for similar crimes were erroneously admitted at trial.  (CT [ECF No. 37-1] at 141-45.)  On June 28, 2011, Petitioner filed a pro se motion to reverse the verdict, arguing: (1) his bicycle injury prevents him from fully extending and raising his right arm, and he walks with a cane due to a bone spur on his heel, misaligned toes and an unusually large callous on the ball of his foot, which, combined with his advanced age, should have eliminated him as a suspect; (2) at the preliminary hearing the victims testified that the robber spoke with an Hispanic accent, but at trial they said he only appeared to have an Hispanic accent because he spoke so softly; (3) Petitioner was falsely identified at the preliminary hearing by the victims as the African-American man who had tried to enter the store seven weeks before the robbery; (4) the prosecutor presented false testimony regarding the holes in the ceiling because the holes were not noted in the police reports even though light from the holes should have been visible during the inspection of the dark crawlspace, and presented false testimony that the motion detector in the crawlspace was disabled, which lacked evidentiary support other than the officer who observed it and the hearsay testimony of the store owner, which could have been disproved by a statement from the alarm company; (5) Petitioner had no motive; and (6) the prosecution merely assumed he was guilty based on his prior crimes.  (RT 146-50.)

On June 28, 2011, the trial judge indicated that he had reviewed Petitioner's two pro se motions, which the judge called "quite comprehensive," and denied them, stating:

> And starting with the motion for mistrial, I see no basis to grant a motion for mistrial in any way, shape, or form.  I think that the evidence that was presented was certainly appropriate.  The jury considered the case, actually at

length, having several aspects of the trial read back to them.  And I just do not see any basis, as set forth in this motion for mistrial, any basis for that motion to be granted.  [¶]  Now, as far as the motion to reverse verdict, I know that Mr. Davis points out the various aspects of the trial which he believes demonstrates that he should not have been convicted, but, again, there is no justification for the court to reverse the verdict, and so that will be denied as well.

(RT 585-86.)

Defense counsel moved to strike five of the six prior strike convictions in order to avoid a life sentence, arguing that Petitioner had been law abiding for the nearly ten years since his release from custody on the 1993 similar offenses, to which he had pled guilty, and which were committed prior to enactment of the Three Strikes law, and sought concurrent sentencing because the robbery involved a continuous course of conduct.  (RT 586-88.)  The prosecutor pointed out that two of the six prior convictions involved armed robberies with real guns, one involved a home invasion robbery, and one involved arson where Petitioner threw two "Molotov Cocktails" into his ex-wife's apartment which started a fire in the bedroom where his three-year-old son was sleeping.  (RT 588-90; Lodgment No. 5 [ECF No. 37-8], People v. Davis, No. D060030, slip op. at 14-15.)  Taylor and Hyde provided victim impact testimony describing the vulnerability and terror they felt that day, and their continuing loss of a sense of safety and well being.  (RT 591-91; Lodgment No. 5 [ECF No. 37-8], People v. Davis, No. D060030, slip op. at 16.)  The trial judge denied the motion to strike, stating that Petitioner had been a career criminal since 1978, and "the three strikes law, in my view, is exactly the type of law that addresses this type of person."  (RT 599.)  The trial judge denied Petitioner's request to address the court prior to sentencing, and sentenced him to two consecutive terms of 25 years-to-life.  (RT 600-03.)

## IV.

## PETITIONER'S CLAIMS

Petitioner alleges that his federal Constitutional right to due process was violated because there was insufficient evidence to support the guilty verdicts, as the only persuasive evidence, the DNA evidence, lacked probative value, in that the probability of a match was confined only

to his racial group, African-American, despite evidence suggesting the robber was Hispanic, which also allowed the jury to infer the robber was African-American.  (Claim 1.)

Petitioner alleges his federal Constitutional right to due process was violated by prosecutorial misconduct where the prosecutor: presented false evidence that Petitioner was remodeling his bathroom, falsely argued that such evidence showed Petitioner was physically able to commit the offense as a lone robber, and falsely argued he fled through the roof hole and down the exterior ladder while the police helicopter was overhead; elicited false testimony from the victims regarding their observations of the robber's image and conduct to the extent it deviated from the police reports and physical layout of the crime scene; failed to establish a chain of custody for the forensic evidence; introduced evidence that the pawned diamond had been stolen in the robbery even though that could not be conclusively established; and withheld evidence of the two suspicious Hispanic males seen in the area, the store's layout, the condition of the mask, video images and sounds, specifications of the roof hole, footprints and fingerprints on the bathroom sink, observations of police officers who searched Petitioner's house who saw his bathroom was not being remodeled, transmissions during the alarm activation, and actions of the first responders.  (Claims 2, 21, 23(a), 24, 29(a), 32(a), 60, 69, 70 and 72-73.)[4]

Petitioner alleges that his federal Constitutional right to due process was violated because the trial judge: allowed a conviction based on insufficient evidence, in that Petitioner did not match the description of the robber, was not identified by the victims, and the DNA evidence was inconclusive and pointed to other suspects; limited defense inquiry into the suspicious Hispanic males seen in the area and instructed the jurors not to consider that evidence; denied Petitioner's pro se post-trial motions without obtaining a waiver of counsel, and abused his discretion in summarily denying the motions without addressing the individual claims; allowed introduction of prior offenses which differed from the current offense, and found them admissible based on a false factual foundation set forth in the People's hearsay trial brief; failed

---

[4] The Court has renumbered the claims 1-75 in the order they are presented in the FAP.  Claims 23, 29, 32, 35, 47 and 48 overlap categories, and they are numbered, for example, 23(a) and 23(b).  *See* Exhibit A for a chart of the claims.

to hold a pre-trial hearing regarding DNA and alibi evidence; excluded incident reports and witness reports of suspects seen fleeing the area; failed to require a chain of custody for the forensic evidence; allowed introduction of irrelevant evidence, including the pawn slip, the pawned diamond, the headband flashlight, the DNA evidence, videos and photographs; refused to accept a stipulation to return the pawn slip and headband flashlight to their owners after trial; failed to require proof that the force or fear element of robbery occurred at the time of the taking; imposed a restitution fine based on an improper valuation of the stolen jewelry; excluded defense witnesses based on hearsay objections; allowed hearsay evidence that Petitioner waived his <u>Miranda</u> rights in the prior convictions; refused Petitioner the right of allocution at sentencing; ordered destruction of the white latex gloves after trial; omitted from the trial record a transcription of a hearing at which sentencing was continued; and was biased and unfair throughout the trial.  (Claims 3, 11, 22, 25-26, 28, 29(b), 30, 32(b), 35(a), 38, 41-42, 44-45, 48(a), 49-50, 52, 54-55, 57, 59, 61-65, 67, 71 and 74.)

Petitioner alleges that his federal Constitutional right to the effective assistance of counsel was violated because his trial counsel: failed to challenge a false identification at the preliminary hearing that Petitioner was the African-American male reported at the jewelry store seven weeks before the robbery, and had a conflict of interest due to counsel or his office representing that person; intentionally delayed the trial, and was unprepared to go to trial, because he had an overbooked calender and had conducted no investigation; harbored a desire to keep a low profile based on his belief that Petitioner was guilty, which caused counsel to spend inadequate time with Petitioner and fail to present any evidence or subject the prosecution's evidence to adversarial testing; failed to seek discovery of phone records which could have established an alibi; failed to file a pre-trial motion to dismiss on the basis that the victims said the robber was Hispanic; failed to present evidence that Petitioner's bicycle and backpack containing his tools were stolen weeks before the robbery in order to explain why his DNA was found at the crime scene; failed to seek suppression of the pawn slip and the pawned diamond on the basis the diamond could not conclusively be linked to the robbery; failed to seek any discovery or present any defense; failed to investigate the crime scene to show that Petitioner could not have escaped

through the roof; failed to present medical evidence showing Petitioner was physically incapable of committing the acrobatic crime; failed to present evidence from Petitioner's friends, fiancé and her children to show they may have been involved in the robbery; failed to request incident reports to challenge the testimony that the motion detector in the crawlspace had been disabled, or insist that an alarm company report be used to establish that fact; failed to move to suppress the prior convictions on the basis of an inaccurate factual basis in the People's trial brief; allowed evidence to be presented that his remodeling of his bathroom showed he was physically able to commit the crime, and failed to present evidence the bathroom was not being remodeled during the search of his house; failed to investigate reports of the suspicious Hispanic men seen in the area, and present that evidence at trial; failed to understand that a robbery was not committed because the victims were assaulted before any property was taken; failed to object on double jeopardy grounds to two convictions for the same conduct; allowed imposition of a restitution fine based on an improper valuation of loss and lack of ability to pay; failed to object to witnesses for lack of discovery; stipulated to the admissibility of the DNA evidence and failed to hire or consult with an expert witness regarding that evidence; and failed to object to hearsay evidence. (Claims 4-10, 12-20, 23(b), 27, 46, 47(a), 48(b), 51, 53, 56, 58, 66, 68 and 75.) He alleges his appellate counsel failed to identify and present meritorious issues, allowed the court to affirm on irrelevant evidence, and failed to challenge the admissibility of the prior offenses, the DNA evidence, and hearsay evidence. (Claims 31 and 47(b).)

Petitioner alleges that his federal Constitutional right to due process was violated by erroneous jury instructions on the intent element of robbery, on reasonable doubt, on circumstantial evidence, on presumption of innocence, regarding consideration of the pawn slip, regarding the definition of "crime," and to consider all of the evidence when most or all of the evidence was "improbable, inadmissible hearsay." (Claims 33-34, 35(b), 36-37, 39-40 and 43.)

## V.

## DISCUSSION

For the following reasons the Court finds that Respondent has failed to carry the burden of demonstrating that any claim is procedurally defaulted. The Court also finds the exhaustion

requirement has been satisfied as to all claims.  The Court finds, with respect to the claims which were adjudicated on the merits by the state court, that the adjudication is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  The Court finds, based on a de novo review, that the remaining claims do not present a basis for habeas relief.  The Court therefore **RECOMMENDS** the First Amended Petition be **DENIED**.

**A.      Standard of Review.**

Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides, with respect to claims which were adjudicated on their merits in the state court, that in order to obtain federal habeas relief, a petitioner must first demonstrate that the state court adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.A. § 2254(d) (West 2006).  Even if the petitioner can satisfy § 2254(d), or show that it does not apply, he still must show a federal constitutional violation occurred.  Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision is "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision involves an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407.  Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."

1  White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter,

2  562 U.S. 86, 103 (2011).

3      "[A] federal habeas court may not issue the writ simply because the court concludes in

4  its independent judgment that the relevant state-court decision applied clearly established federal

5  law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable."

6  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).

7  Clearly established federal law "refers to the holdings, as opposed to the dicta," of United States

8  Supreme Court decisions at the "time of the relevant state-court decision." Williams, 529 U.S.

9  at 412.  To satisfy § 2254(d)(2), a petitioner must demonstrate that the factual findings upon

10  which the state court's adjudication of his claims rest, assuming it rests upon a determination of

11  the facts, are objectively unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

12      "As a condition for obtaining habeas corpus from a federal court, a state prisoner must

13  show that the state court's ruling on the claim being presented in federal court was so lacking

14  in justification that there was an error well understood and comprehended in existing law beyond

15  any possibility for fairminded disagreement." Richter, 562 U.S. at 103.  The Supreme Court has

16  stated that "[i]f this standard is difficult to meet, that is because it was meant to be . . . [as it]

17  preserves authority to issue the writ in cases where there is no possibility fairminded jurists could

18  disagree that the state court decision conflicts with this Court's precedents." Id. at 102-03

19  ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions

20  in the state criminal justice systems, not a substitute for ordinary error correction through

21  appeal.") (internal quotation marks omitted).

22      When a federal habeas court addresses a claim which has not been adjudicated on the

23  merits in state court, pre-AEDPA de novo review is required.  Pirtle v. Morgan, 313 F.3d 1160,

24  1167-68 (9th Cir. 2002).  Under such a review, "state court judgments of conviction and

25  sentence carry a presumption of finality and legality and may be set aside only when a state

26  prisoner carries his burden of proving that [his] detention violates the fundamental liberties of

27  the person, safeguarded against state action by the Federal Constitution." Hayes v. Brown, 399

28  F.3d 972, 978 (9th Cir. 2005) (en banc).

**B.    Claim 1**

Petitioner contends in Claim 1 that his federal Constitutional right to due process was violated because there was insufficient evidence to support the verdicts because the DNA evidence lacked probative value. (FAP [ECF No. 13] at 3.)  The DNA evidence presented the statistical probability of a DNA match for an African-American other than Petitioner.  Petitioner argues here, as he did in state court, that because the racial identity of the perpetrator was unknown and evidence suggested the robber was Hispanic, the DNA evidence (1) also needed to present the random DNA match probability for other major ethnic groups, (2) unfairly insinuated Petitioner was the robber, and (3) lacked evidentiary value.  (Id. and ECF No. 13-10 at 110-18.)

Respondent answers that the appellate court's denial of the claim (on the basis that confining the DNA probability to Petitioner's ethnic group did not reduce its evidentiary force, but even if it did, or if it insinuated the robber's ethnicity, sufficient evidence still existed to support the convictions), was not contrary to or an unreasonable application of clearly established federal law, because there is no United States Supreme Court authority applicable to the DNA aspect of the claim.  (Ans. Mem. [ECF 36-1] at 14.)  Respondent also argues that even assuming the probative value of the DNA evidence was diminished, the remaining evidence of guilt is sufficient to uphold the verdicts.  (Id.)

Petitioner presented Claim 1 to the state supreme court in a petition for review of the appellate court opinion affirming his convictions on direct appeal.  (Lodgment No. 6 [ECF No. 37-9].)  The state supreme court summarily denied the petition without citation of authority or a statement of reasoning.  (Lodgment No. 7 [ECF No. 37-10].)  Petitioner presented the same claim in his First State Appellate Court Habeas.  (Lodgment Nos. 3-4 [ECF Nos. 37-6, 37-7].)  That court denied the claim on the merits.  (Lodgment No. 5 [ECF 37-8])

In Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991), the Court adopted a presumption which gives no effect to unexplained state court orders but "looks through" them to the last reasoned state court decision.  The Court will look through the silent denial of Claim 1 by the state supreme court to the appellate court opinion, which stated:

1   Davis asserts the record does not support the jury's finding that he was the
perpetrator of the robbery because the DNA evidence lacked probative value, and
2   there was no other persuasive evidence linking him to the crime. To support his
challenge to the DNA evidence, Davis asserts that the prosecution's DNA
3   statistical evidence only showed the rarity of the DNA profile in the
*African–American population*, whereas it failed to present statistical evidence
4   showing the rarity of the profile in the *general population*. He contends that
because the racial identity of the perpetrator was unknown, the population of
5   possible perpetrators was not limited to African–Americans, and absent evidence
as to the frequency of the profile in the two other major population groups
6   (Caucasian and Hispanic) the DNA evidence lacked any evidentiary force.

7   To support his position, Davis relies on the California Supreme Court's
analysis and holding in *People v. Wilson* (2006) 38 Cal.4th 1237 (*Wilson*). The
8   *Wilson* court explained that DNA analysis involves determining whether there is
a match between the suspect's DNA profile and the crime-scene DNA and, if so,
9   calculating through statistical analysis the probability that a person other than the
suspect, randomly selected from the relevant population, will have this same
10   profile. (*Id*. at pp. 1240, 1242, 1245.) Because profile frequencies between the
different racial and ethnic groups vary, separate frequency calculations are made
11   for different population groups to increase the accuracy of the estimates of profile
frequency. (*Id*. at pp. 1239–1240, 1242, 1247.) The *Wilson* court rejected the
12   defendant's argument that if the race or ethnicity of the perpetrator is unknown,
statistical probability evidence regarding any particular population group is
13   irrelevant. (*Id*. at pp. 1240, 1242–1245.) Instead, *Wilson* concluded that even
when the perpetrator's race or ethnicity is unknown, it is proper to present the jury
14   with a range of frequencies based on the three most common population groups
in the United States (Caucasian, African–American, and Hispanic) because this
15   evidence is relevant to show the rarity of the profile; i.e., that "most persons of at
least major portions of the general population could not have left the evidence
16   samples." (*Id*. at pp. 1242–1245.)

17   In its analysis, the *Wilson* court observed that to determine the odds of a
DNA match for someone other than the perpetrator, the relevant population group
18   that should be statistically evaluated is the group to which the perpetrator belongs
or might belong. (*Wilson, supra*, 38 Cal.4th at pp. 1243, 1245.) Thus, for
19   example, if the perpetrator is known to be Caucasian, it is proper to present the
jury with frequency data only for Caucasians. (*Id*. at pp. 1245, 1249; accord,
20   *People v. Geier* (2007) 41 Cal.4th 555, 611.) In contrast, if the perpetrator's race
or ethnicity is unknown or uncertain, the jury should be presented with a range of
21   frequency data from the major population groups to which the perpetrator might
belong. (*Wilson, supra*, at pp. 1242–1245, 1249.) [FN6]

22
FN6. The *Wilson* court rejected the contention that the prosecution
23   was required to present frequency evidence for *all* possible groups
to which the perpetrator could belong (for example Asians and
24   Native Americans), rather than just the three most common
population groups. (*Wilson, supra*, 38 Cal.4th at p. 1249.) The
25   court reasoned that although "giving results for all possible groups
would be permissible, doing so is not required to give relevance to
26   the range of possibilities." (*Id*. at p. 1250.)

27   In reaching its conclusions, the *Wilson* court disapproved the holding in
*People v. Pizarro* (2003) 110 Cal.App.4th 530 that no frequency evidence should
28   be admitted absent evidence showing the perpetrator's race or ethnicity. (*Wilson,
supra*, 38 Cal.4th at pp. 1244, 1250–1251.) However, *Wilson* affirmed *Pizarro's*

conclusion that frequency evidence should not be confined solely to the defendant's population group when the perpetrator's race or ethnicity is unknown. (*Wilson, supra,* at pp. 1243, 1250–1251.)   *Wilson* explained that when the perpetrator's racial or ethnic identity is unknown, presentation of the rarity statistics only for the defendant's population group could suggest to the jury, without an evidentiary basis, "'that the race (or ethnicity) of the perpetrator is the same as the race (or ethnicity) of the defendant.'" (*Wilson, supra,* 38 Cal.4th at pp. 1243, 1247, 1250; see *People v. Geier, supra,* 41 Cal.4th at pp. 609–610 (defendant could properly object that population frequency evidence based solely on defendant's race or ethnicity was "unfairly skewed" to defendant's detriment because it might improperly suggest to jury that perpetrator was member of defendant's race or ethnic group).)

Notwithstanding this directive in *Wilson,* we are not persuaded by Davis's contention that frequency evidence based solely on the defendant's population group necessarily loses all probative value if it is not coupled with probability evidence for a larger class of possible perpetrators.   *Wilson* stands for the proposition that even when the race or ethnicity of the perpetrator is unknown, evidence showing the range of profile frequencies based on the major population groups is relevant because these groups represent a large portion of the general population, and hence the evidence sheds light on the rarity of the profile and the odds that there could be a DNA match for someone other than the defendant. Profile frequency evidence solely for African–Americans does not, standing alone, present the jury with a complete picture of the relevant population because African–Americans are only one of the three major population groups.   However, this does not mean the evidence loses *all* probative value concerning the rarity of the DNA match.   Because African–Americans are a *major* population group, evidence showing that there is an exceedingly low probability of a DNA match with another African–American carries significant probative value on the issue of whether the prosecution has proven that the defendant is the perpetrator.   The fact that frequency evidence for *all three* major population groups has *greater* probative value than frequency evidence for *only one* of the three major groups, does not mean the latter has no evidentiary force to support a jury's verdict.

In short, the reason *Wilson* directs the courts not to confine the probability evidence to the defendant's own group is not because the latter evidence is necessarily of no probative value, but rather because it could mislead the jury to infer, without evidentiary support, that the perpetrator is the same race or ethnicity as the defendant.   Here, if defense counsel had objected to the frequency evidence solely for African–Americans, it would have been proper for the trial court to condition admission of the evidence on the presentation of data concerning all three major population groups.   However, the failure to present the frequency evidence for all three groups did not entirely obviate the probative value of the data concerning one of these major population groups.

Turning to the sufficiency of the evidence of identity in its totality, we examine the entire record in the light most favorable to the judgment, and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence, to determine if a rational trier of fact could find the defendant guilty beyond a reasonable doubt.   (*People v. Smith* (2005) 37 Cal.4th 733, 738–739.)   The record supports the jury's finding that Davis was the robber. The frequency data showing that there was a 1 in 85 quintillion chance of a DNA match with an African–American supported that no other African–American was the perpetrator.   Although the expert did not present the frequency data for the other two major population groups (Caucasian and Hispanic), she testified that she performs these additional calculations when she conducts her DNA analysis, and

-24-

the variations between the groups are not large.  From this testimony, the jury could reasonably infer that, in accordance with the expert's standard practice, in this case she calculated the profile frequencies for all three major population groups, and her results showed that the odds of a DNA match with a person from the other two major population groups was, as with the African–American population, extremely low.  (See *People v. Cua* (2011) 191 Cal.App.4th 582, 596, 601 (DNA expert's uncontradicted testimony that crime-scene stain "'belonged to'" defendant supported inference that rarity statistics would support this conclusion even though expert was not asked about rarity statistics); *People v. Pizarro, supra*, 110 Cal.App.4th at p. 630 ("'There are good reasons to assume that under ethnic heterogeneity the suspect's profile is more frequent in his own population than in many (if not most) others'").)  The jury could also consider that if the rarity statistics for the other two major population groups were significantly more favorable to Davis than the African–American rarity statistic, the defense would likely have presented this evidence to rebut the statistical evidence presented by the prosecution.  (See *People v. Brady* (2010) 50 Cal.4th 547, 566 (jury may consider defense failure to introduce available material evidence to refute prosecution case); see also *Wilson, supra*, 38 Cal.4th at p. 1250; *People v. Cua, supra*, 191 Cal.App.4th at p. 601.)

Additionally, Davis was tied to the robbery by virtue of the rare, high-quality diamond he pawned at a pawn shop that matched the characteristics of the diamonds in a ring that was stolen from the store.  He was also found in a possession of a headband flashlight, which the jury could infer was a useful tool on a roof-top at night and/or in a dark crawlspace.  Further, the evidence showed that in 1993 Davis had committed three robbery or burglary offenses for which the means of entry was a hole in the roof, which was the same highly distinctive modus operandi used by the robber in the current offense.  Although these prior offenses occurred 16 years before the current offense, the fact that all the offenses involved the same relatively sophisticated means of entry supported an inference that Davis engaged in the behavior that comprised the charged offense.

Based on the evidence concerning the DNA match, the possession of the diamond and headband flashlight, and the commission of numerous offenses involving a highly distinctive modus operandi, there is sufficient evidence to support the jury's finding that Davis was the robber beyond a reasonable doubt.  Other evidentiary factors cited by Davis to defeat the jury's verdict (i.e., that he was not seen at the store before or after the robbery, and that the victims initially described the robber as having a Hispanic accent) were relevant for the jury to consider, but they do not compel a finding contrary to the jury's verdict.

(Lodgment No. 5 [ECF No. 37-8], People v. Davis, No. D060030, slip op. at 7-13.)

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  The Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 324 (1979).

1    Federal habeas courts must analyze <u>Jackson</u> claims "with explicit reference to the

2    substantive elements of the criminal offense as defined by state law."  <u>Id.</u> at 324 n.16; <u>see also</u>

3    <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) (holding that "a state court's interpretation of state

4    law . . . binds a federal court sitting in habeas corpus.").  The Court must "apply the standards

5    of <u>Jackson</u> with an additional layer of deference" when AEDPA applies, and can only grant

6    relief if the state court's decision was objectively unreasonable.  <u>Juan H. v. Allen</u>, 408 F.3d

7    1262, 1274 (9th Cir. 2005).  A federal habeas court must ask whether the relevant state court

8    adjudication "reflected an unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of this

9    case."  <u>Id.</u> at 1275.

10    Petitioner argues that the case against him was circumstantial, and based mostly on his

11    history of having committed crimes which appear to be similar but are actually dissimilar, and

12    therefore the failure to compute the statistical possibilities that DNA recovered from the mask

13    and gun matched persons in other ethnic groups was prejudicial, particularly where there was

14    more than one DNA contributor and evidence the robber was Hispanic.  However, as the

15    appellate court noted, the DNA expert testified there are only slight variations between the three

16    major ethnic groups, African-American, Caucasian and Hispanic.  Under questioning by the

17    prosecutor, the DNA expert testified:

18    Q.    Now, after you determined that the DNA profile from the mask and
         the gun matched the reference sample of [Petitioner], are you able
19       to do any calculations to show the rarity of matching the DNA types
         to the evidence item?

20    A.    Yes.

21    Q.    And what are those called?

22    A.    The calculation that I performed is called a frequency of occurrence
23       estimate.  And what that tells me is if I were to randomly select
         somebody from the population, this is the probability that they
24       would have the same DNA type as what I'm observing in the
         evidence.

25    Q.    Now, these calculations, are they done for the three major
26       population groups?

27    A.    Yes, they are.

28    Q.    And would that be Caucasian, African-American, and Hispanic?

1    A.    Yes.

2    Q.    Why only those three population groups?

3    A.    There is some variation in DNA frequencies from one population to another, but the variations are really not very significant. I do a calculation on all three for a couple reasons. First of all, it's general practice for criminalists to do that, but also it's to show, yes, there is variation, but it's really not a huge amount of variation.

6    Q.    Okay. And for the estimated frequency of occurrence of the major DNA profiles of [the mask and gun], what were your calculations for that?

8    A.    So the estimated frequency of occurrence for the major DNA profile that I observed in the evidence is one in 85 quintillion.

    Q.    And is that for the African-American population?

    A.    That number is, yes.

    Q.    And quintillion, how may zeros is that?

    A.    So it would be an 85 with 18 zeros behind it.

    Q.    And what it the approximate population of the world?

    A.    The population of the world is estimated to be between 6 and 7 billion.

(RT 337-38.)

Thus, the DNA expert testified that she routinely calculated probability estimates for all three major ethnic groups, and there was not a significant variation between them. The appellate court therefore reasonably found the jury was provided with an accurate probability estimate that Petitioner's DNA matched the DNA found on the mask and gun left at the crime scene.

The appellate court also reasonably observed that other evidence supported the verdicts, including Petitioner's prior convictions on three very similar, or as the investigating detective testified, unique, crimes, involving access to a business through the roof, confronting the employees with a non-lethal pistol after they disabled the alarm, leaving a gun and other items behind, and blaming an unnamed Hispanic person. (RT 253-67.) Petitioner argues that he only made the hole in the roof in the Stevens Gun burglary for the people who went inside, and there were dissimilarities between the other two prior robberies and the instant robbery, as he escaped through doors in the prior robberies not the roofs, did not disable alarms in the prior robberies,

and the instant roof hole was made with a saw whereas he tore off the roofing materials in the prior offenses.  (Supp. Traverse [ECF No. 42] at 26, 151-55.)  Nevertheless, his admission that he made the holes after he cased the stores and observed their alarm systems, his admission that he entered the Pep Boys and Checkmate stores and confronted the employees with a weapon after they disabled the alarm, and his admission that he utilized his experience in the construction trades to make the roof holes in all three crimes, must be viewed "in the light most favorable to the prosecution," and seen in that light it is clear the state appellate court reasonably determined they supported an inference that Petitioner was the robber in the instant offense.  Jackson, 443 U.S. at 319 (holding that a federal habeas court must respect the province of the jury to draw reasonable inferences from the evidence).

There was also evidence that Petitioner pawned a diamond about three weeks after the robbery which was similar to a very rare diamond stolen in the robbery.  Although Petitioner argues the diamond should not be considered because it was not introduced at trial (see Reply [ECF No. 47] at 1-2), and could not reliably be traced to the robbery (Supp. Traverse [ECF No. 42] at 109), there was testimony it was a very rare diamond, that a diamond with similar cut, carat weight, and clarity had been mounted in a ring stolen in the robbery, and that removal of a gem from its mounting is an effective way to prevent identification.  (RT 296-98, 393, 398.)

Petitioner also contends he does not match Hyde's description of the robber, slim and about five-feet, eight inches tall, and does not look like the robber in the videotape, who he contends is not much taller than Taylor, who is five-feet, four inches tall.  (RT 195, 1003.) However, the probation report lists Petitioner as five-feet, ten-inches tall, weighing 170 pounds (CT [ECF No. 37-1] at 94), and the jury was able to view the robber on the videotape, and freely observe Petitioner in the courtroom (he was not in custody during the trial), and make that determination for themselves.  See Coleman v. Johnson, 566 U.S. ___, 132 S.Ct. 2060, 2065 (2012) ("The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality.").

//

//

Considering the additional layer of deference a federal habeas court is required under AEDPA to give over and above the deference required by <u>Jackson</u>, this Court cannot say that the appellate court's opinion involved an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u>.  <u>Juan H.</u>, 408 F.3d at 1275; <u>see also</u> <u>Richter</u>, 562 U.S. at 102-03 ("If this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents.").  Addressing the claim with explicit reference to state law as interpreted by the appellate court, and resolving any conflicts regarding whether the jury made the proper findings in favor of the verdict, as this Court must, the Court finds that the state court adjudication of this claim was neither contrary to, nor involved an unreasonable application of, <u>Jackson</u> or <u>Winship</u>, and was not based on an unreasonable determination of the facts.  <u>Woodall</u>, 134 S.Ct. at 1706-07; <u>Richter</u>, 562 U.S. 102-03; <u>Bradshaw</u>, 546 U.S. at 76; <u>Andrade</u>, 538 U.S. at 75-76; <u>Miller-El</u>, 537 U.S. at 340; <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Winship</u>, 397 U.S. at 364; <u>Juan H.</u>, 408 F.3d at 1275.  The Court **RECOMMENDS** habeas relief be **DENIED** as to Claim 1.

## C.    Claims 2-75

Claims 2-75 fall into four overlapping categories, alleging: (1) prosecutorial misconduct, (2) ineffective assistance of counsel, (3) trial court error, and (4) jury instruction error.  (FAP [ECF No. 13] at 3-23.)  The claims are briefly outlined in the FAP, which is supported by 2135 pages of exhibits, including several state court briefs.  (ECF No. 13.)  The Supplemental Traverse contains about 150 pages of detailed argument in support of the claims (Supp. Travers [ECF No. 42] at 15-164), and is supported by over 1400 pages of exhibits.  (ECF No. 42.)

As detailed below, Petitioner presented all but one of these claims in his six state habeas petitions, but not all claims were presented in each petition.  He presented about two-thirds of the claims to the state trial, appellate, and supreme courts in a final, complete round of state habeas review.  Those claims were adjudicated on the merits in the appellate court and denied by the state supreme court on the basis of a state procedural rule barring repetitious and piecemeal litigation.  As will be seen, Respondent has not carried the burden of demonstrating

those claims are procedurally defaulted, and the United States Supreme Court has instructed that a state bar on relitigation of claims does not prevent a federal habeas court from looking through to an underlying merits determination where, as here, there is one. Thus, this Court will apply the provisions of 28 U.S.C. § 2254(d) to the appellate court opinion as to those claims.

Also as detailed below, Respondent has not carried the burden of demonstrating that the procedural bars applied to the remaining claims support a procedural default in this Court. Under a de novo review, the Court finds those claims, and the claim which was not presented to any state court, do not support a grant of federal habeas relief. The Court also finds that the exhaustion requirement has been satisfied as to all claims.

### 1.    Procedural Default/Exhaustion

Respondent argues that the claims presented in Petitioner's First State Supreme Court Habeas petition are procedurally defaulted by virtue of the <u>Lindley</u> and <u>Dixon</u> citations in the order denying that petition, which Respondent contends is an indication the claims were denied on the basis that they were required to have been raised on direct appeal rather than on habeas. (Ans. Mem. [ECF 36-1] at 15-16.) Respondent contends that Petitioner has not exhausted his state court remedies as to those claims because the order's citations to <u>Duvall</u> and <u>Swain</u> indicate the claims were presented to the state court in a procedurally improper manner. Furthermore, Respondent argues that Petitioner retains the right under state law to return to state court and properly plead those claims. Respondent nonetheless invites this Court to deny those claims despite the failure to exhaust because they are facially without merit. (<u>Id.</u> at 16-18.) Respondent contends that the claims presented in the Second State Supreme Court Habeas, which were also denied with citations to <u>Dixon</u>, <u>Lindley</u>, <u>Duvall</u> and <u>Swain</u>, among other cases, are procedurally defaulted and unexhausted for the same reasons, and that they also can be denied in this Court despite the failure to exhaust because they lack merit. (<u>Id.</u> at 18-20.)

Respondent contends the claims Petitioner raised in the First Trial Court Habeas petition are unexhausted because Respondent "has been unable to identify a habeas corpus petition filed by" Petitioner in the state supreme court raising those claims. (<u>Id.</u> at 21.) Respondent contends the claims presented in the Second Trial Court Habeas petition (a copy of which constituted the

First State Appellate Court Habeas petition and the Third [Final] State Supreme Court Habeas petition), are procedurally defaulted because they were eventually denied by the state supreme court on the basis of a state rule barring repetitious or piecemeal litigation.  Respondent further argues that, nonetheless, the claims are facially without merit and can be denied in this Court on that basis.  (Id. at 21-23.)

Petitioner replies that he has exhausted his state court remedies because he has presented all of his claims to the state supreme court.  (Traverse [ECF No. 40] at 1.)  He argues that the state supreme court orders do not support a procedural default because they do not indicate which procedural bars were applied to which claims, and that Respondent has failed to adequately review the state court petitions to determine which claims were raised in which petitions.  (Id. at 16-18.)  He also disputes the contention that his claims are facially without merit.  (Id. at 17-21.)

### a)  presentation of claims to the state courts

Petitioner's First State Supreme Court Habeas petition was filed in the state supreme court on May 9, 2012, while his Direct Appeal was pending in the appellate court.  (Lodgment No. 16 [ECF 37-21].)  The following chart shows which of the claims presented in the instant petition were raised in the First State Supreme Court Habeas:

| Claim Category | Claims Raised | Claims Not Raised |
|---|---|---|
| Trial Error - Gen | 3, 11, 22, 25-26, 28, 29(b), 30, 35(a), 38, 41-42, 48(a), 49-50, 54, 59, 62, 64, 67 and 71 | 32(b), 44-45, 52, 55, 57, 61, 63, 65 and 74. |
| IAC - Trial Counsel | 4-10, 12-20, 23(b), 27, 46, 53, 56, 66, 68 and 75 | 47(a), 48(b), 51 and 58 |
| Prosecutorial Misconduct | 2, 21, 23(a), 24, 29(a), 60, 69 and 72-73 | 32(a) and 70 |

(Id. at 3-66.)  That petition was denied on August 8, 2012, prior to the appellate court ruling on the Direct Appeal, with an order stating: "The petition for writ of habeas corpus is denied.  (See *People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Swain* (1949) 34 Cal.2d 300, 304; *In re Dixon*

(1953) 41 Cal.2d 756, 759; *In re Lindley* (1947) 29 Cal.2d 709, 723.)" (Lodgment No. 17 [ECF No. 37-22], *In re Davis*, No. S202405, order at 1.)

On October 2, 2012, about two months after that First State Supreme Court Habeas petition was denied, Petitioner filed his First Trial Court Habeas petition in the trial court which omitted the prosecutorial misconduct claims; added claims of ineffective assistance of counsel not presented in the first habeas petition (Claims 47(a), 48(b), 51 and 58), thus raising all of the ineffective assistance of counsel claims raised here except Claims 9, 17 and 23(b); and raised all the claims of trial court error presented here except Claims 32(b), 44-45, 63-64 and 74. (Lodgment No. 8 [ECF No. 37-11] at 3-34.) That petition was denied on November 14, 2012, on the basis that the claims were vague, unsupported by documentation or legal authority, and failed to state a prima facie case for relief. (Lodgment No. 9 [ECF No. 37-12], In re Davis, HCN1251, order at 3-4.)

Petitioner thereafter filed a Second Trial Court Habeas petition, his third state habeas petition, where he presented:

| Claim Category | Claims Raised | Claims Not Raised |
|---|---|---|
| Trial Error - Gen | 3, 11, 29(b), 30, 32(b) 35(a), 41, 44, 49-50, 54, 57, 59, 61-65, 67, 71 and 74 | 22, 25-26, 28 ,38, 42, 45, 48(a), 52, 55 |
| IAC - Trial Counsel | 4-9, 12-17, 19, 23(b), 27, 46, 53, 56, 58, 66, 68 and 75 | 10, 18, 20, 46, 47(a), 48(b) and 51 |
| Prosecutorial Misconduct | 2, 21, 23(a), 24, 29(a), 32(a), 60, 69, 70 and 72-73 (All) | |

(Lodgment No. 10 [ECF No. 37-13] at 8-21, 43-48, 51-55, 58-59, 61.) That petition was denied on May 23, 2013, in an order which states in relevant part:

> In this Petition, Petitioner again makes numerous assertions regarding alleged violations of his rights. These claims are duplicative and overlap his claims in his previous Petition for Writ of Habeas Corpus which this Court denied on November 14, 2012.

Unless a Petitioner can justify the filing of numerous habeas corpus petitions, the reviewing Court may summarily deny the current petition in its entirety. In re Clark (1995) 5 Cal. 4th 750. "When a habeas corpus petition is denied on the merits, the court has determined that the claims made in that petition do not state a prima facie case entitling the petitioner to relief. A successive petition presenting additional claims that could have been presented in an earlier attack on the judgment is, of necessity, a delayed petition. Petitioner offers no persuasive reason for routinely permitting consideration of the merits of such claims." In re Clark (1993) 5 Cal. 4th 750, 770. Petitioner raised these claims or could have previously raised these claims in his Petition which was denied on November 14, 2012.

Petitioner has failed to make a prima facie showing of specific facts which would entitle him to habeas corpus relief under existing law. In re Hochberg (1970) 2 Cal. 3d 870, 875 fn. 4. As such, the Petition for Writ of Habeas Corpus is hereby denied.

(Lodgment No. 11[ECF No. 37-15], In re Davis, No. HCN1251, order at 1-2.)

Before the trial court issued that order on May 23, 2013, Petitioner filed his Second State Supreme Court Habeas petition on May 9, 2013, his fourth habeas petition. (Supplemental Lodgment No. 1 [ECF No. 45-1].) In this petition, he presented his jury instruction claims for the first and only time in any state court petition and presented a claim as to ineffective assistance of appellate counsel, among other claims:

| Claim Category | Claims Raised | Claims Not Raised |
|---|---|---|
| Trial Error - Gen | 11, 30, 32(b), 35(a), 38, 42, 49-50, 63, 65, 67 and 71 | 3, 22, 25-26, 28, 29(b), 41, 44-45, 48(a), 52, 54-55, 57, 59, 61-62, 64 and 74 |
| Trial Error - Instructions | 33-34, 35(b), 36-37, 39-40 and 43 (All) | |
| IAC - Trial Counsel | | |
| IAC - Appellate Counsel | 31 | 47(b) |
| Prosecutorial Misconduct | | All |

(Id.) That petition was denied by an order which stated: "The petition for writ of habeas corpus is denied. (See In re Clark (1993) 5 Cal.4th 750, 767-769; People v. Duvall (1995) 9 Cal.4th 464, 474; In re Waltreus (1965) 62 Cal.2d 218, 225; In re Dixon (1953) 41 Cal.2d 756, 759; In re Swain (1949) 34 Cal.2d 300, 304; In re Lindley (1947) 29 Cal.2d 709, 723; In re Miller

-33-

1  (1941) 17 Cal.2d 734, 735.)   [¶]   Werdegar, J., was absent and did not participate."

2  (Supplemental Lodgment No. 2, In re Davis, No. S210668, order at 1.)

3       On June 28, 2013, Petitioner filed his First State Appellate Court Habeas petition in the

4  state appellate court, the only one he filed in that court, which was a copy of his Second Trial

5  Court Habeas petition.  The claims presented are as follows:

6

7

| Claim Category | Claims Raised | Claims Not Raised |
|---|---|---|
| Prosecutorial Misconduct | 2, 21, 23(a), 24, 29(a), 32(a), 60, 69, 70, 72, 73 | |
| IAC - Trial Counsel | 4, 5, 6, 7, 8, 9, 12, 13, 14, 15, 16, 17, 19, 27, 46, 53, 56, 58, 66, 68, 75 | 10, 18, 20, 23(b), 31, 47(a), 47(b), 48(b), 51 |
| Trial Error - Gen | 3, 11, 29(b), 30, 32(b), 35(a), 41, 44, 49-50, 54, 57, 59, 61, 62, 63, 64, 65, 67, 71, 74 | 22, 25, 26, 28, 38, 42, 45, 48(a), 52, 55 |

15  (Lodgment No. 12 [ECF No. 37-16] .)  That petition was denied on August 13, 2013, in an order

16  which states in relevant part:

17       Petitioner now asserts 18 grounds for relief in his petition, plus an
18  additional 13 grounds in a petition filed in the superior court that he asks this court
     to also consider.  The vast majority of his contentions concern the admissibility
19  and sufficiency of evidence at trial.  All of his contentions could have been raised
     on direct appeal.  It is the general rule that in the absence of special circumstances,
20  the writ will not lie where the claimed errors could have been, but were not, raised
     upon a timely appeal from a judgment of conviction.  (In re Clark (1993) 5 Cal.4th
21  750, 765.)  Additionally, habeas corpus is not an available remedy to review the
     ruling of the trial court with respect to the admission or exclusion of evidence.  (In
     re Lindley (1947) 29 Cal.2d 709, 723.)  [¶] . . . [¶]
22
     Here, the petition presents conclusory allegations that, even if accepted as
23  true, do not demonstrate that the alleged errors prejudiced Davis.  As discussed on
     appeal, DNA evidence found at the scene of the crime matched Davis's DNA.  An
24  analysis of this DNA revealed that the probability that the DNA was from
     someone other than Davis is 1 in 85 quintillion.  On appeal, this court held that the
25  admission of this evidence was proper.  This evidence is sufficient to support the
     jury's verdict even if Davis's other contentions were meritorious.
26
     Davis also raises several claims of ineffective assistance of counsel based
27  on his trial counsel's actions at trial and his failure to investigate.  Davis has not
     shown that his trial attorney failed to act in a manner to be expected of reasonably
28

-34-

14cv0560

competent counsel and a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland v. Washington* (1994) 466 U.S. 668, 688-694.)

(Lodgment No. 13 [ECF No. 37-18], <u>In re Davis</u>, No. D064132, order at 1-2.)

On September 25, 2013, Petitioner filed a petition for a writ of error corum vobis in the state appellate court challenging the admissibility of the DNA evidence. (Lodgment No. 14 [ECF No. 37-19] at 1-2.) That petition was denied on the basis that Petitioner had not set forth a prima facie case for relief. (Lodgment No. 15 [ECF No. 37-20], <u>Davis v. Sup. Ct.</u>, No. D064629, order at 2.)

Finally, on September 30, 2013, Petitioner filed his Third State Supreme Court Habeas petition, which was his sixth state habeas petition. (Lodgment Nos. 18-21 [ECF Nos. 37-23 through 37-28].) In that petition he presented the claims from his prior First State Appellate Court Habeas petition and the identical Second Trial Court Habeas petition, and added Claims 18, 31 and 46:

| Claim Category | Claims Raised | Claims Not Raised |
|---|---|---|
| Trial Error- Gen | 3, 11, 29(b), 30, 32(b), 35(a), 41, 44, 49-50, 54, 57, 59, 61-65, 67, 71, 74 | 22, 25, 26, 28, 38, 42, 45, 48(a), 52, 55 |
| Trial Error - Instructions | | 33, 34, 35(b), 36, 37, 39, 40, 43 |
| IAC - Trial Counsel | 4, 5, 6, 7, 8, 9, 12, 13, 14, 15, 16, 17, 18, 19, 27, 46, 53, 56, 58, 66, 68, 75 | 10, 20, 23(b), 47(a), 48(b), 51 |
| IAC - Appellate Counsel | 31, 47(b) (All) | |
| Prosecutorial Misconduct | 2, 21, 23(a), 24, 29(a), 32(a), 60, 69, 70, 72, 73 (All) | |

(Lodgment No. 18 [ECF No. 37-23] at 3-33; Lodgment No. 19 [ECF No. 37-25] at 1-73 and [ECF No. 37-26] at 1-84; Lodgment No. 20 [ECF No. 37-27] at 1-73.) The Third State Supreme Court petition was denied with an order which stated: "The petition for writ of habeas corpus is denied. (See *In re Clark* (1993) 5 Cal.4th 750, 767-769.)." (Lodgment No. 22 [ECF No. 37-29], <u>In re Davis</u>, No. S213698, order at 1.)

14cv0560

**b) exhaustion**

In order to exhaust state judicial remedies, a state prisoner must present the state's highest court with a fair opportunity to rule on the merits of every issue raised in their federal habeas petition. Granberry v. Greer, 481 U.S. 129, 133-34 (1987); Duncan v. Henry, 513 U.S. 364, 365-66 (1995). The claims must be "fairly presented" to the state court, that is, in a manner which allows that court to have "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." Picard v. Connor, 404 U.S. 270, 275-76 (1971). The "fair presentation" requirement is not satisfied where a claim is presented in a procedural manner which precludes consideration by the state court. Castille v. Peoples, 489 U.S. 346, 351 (1989), citing Pitchess v. Davis, 421 U.S. 482, 488 (1975) (holding that presentation of claims to the California appellate and supreme courts in a procedurally improper writ of prohibition did not constitute proper presentation and did not exhaust the claims).

The exhaustion requirement also can be met if there is an absence of state judicial remedies. Castille, 489 U.S. at 351 ("The requisite exhaustion may nonetheless exist, of course, if it is clear that respondent's claims are now procedurally barred under [state] law."), citing Engle v. Isaac, 456 U.S. 107, 125 n.28 (1982) ("[The exhaustion] requirement, however, refers only to remedies still available at the time of the federal petition.") In addition, federal courts have discretion to deny a habeas application on the merits notwithstanding a petitioner's failure to exhaust state remedies. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1992) (holding that a district court can deny a claim which has not been presented to the state court if it does not present a colorable claim for relief).

As detailed above, Petitioner presented all of his claims to the California Supreme Court except Claims 45, 47(a), 47(b), 48(b), 51-52 and 55. As detailed below, all of his claims were adjudicated on the merits in state court except those claims and Claims 10, 18, 20, 22, 23(b), 25-26, 28, 31, 33-34, 35(b), 36-40, 42-43 and 46. Respondent contends that the claims which have not been presented to the state supreme court are unexhausted, and that the claims which were

1    denied in the first two state supreme court petitions with citations to <u>Swain</u> and <u>Duvall</u>,[5] are

2    unexhausted because Petitioner retains the right to return to state court to attempt to cure that

3    pleading defect.  (Ans. Mem. [ECF 36-1] at 16-20.)

4          The Court finds the exhaustion requirement is now satisfied with respect to all claims

5    presented in the First Amended Petition because, after more than three years and seven state

6    collateral review petitions to which numerous state procedural bars have been applied, the court

7    concludes Petitioner no longer has state court remedies available to him with respect to these

8    claims.  <u>See</u> <u>Cassett v. Stewart</u>, 406 F.3d 614, 621 n.5 (9th Cir. 2005) (holding that a habeas

9    petitioner "meets the *technical* requirements for exhaustion [when] there are no state remedies

10   any longer 'available' to him."); <u>see also</u> <u>Walker v. Martin</u>, 562 U.S. 307, ___, 131 S.Ct. 1120,

11   1125-31 (2011) (holding that California's timeliness rule requiring that a petitioner must seek

12   habeas relief without "substantial delay" as "measured from the time the petitioner or counsel

13   knew, or should reasonably have known, of the information offered in support of the claim and

14   the legal basis for the claim," is clearly established and consistently applied).  In any case, as set

15   forth below, the claims which were not adjudicated on the merits in state court - the only claims

16   which are even arguably unexhausted - are so lacking in merit that they can be denied

17   notwithstanding any failure to properly present them to the state court.  <u>Acosta-Huerta</u>, 7 F.3d

18   at 142.

19              **c) procedural default**

20         In order to preclude federal review based on a procedural default, a state procedural bar

21   must rest on a state ground which is "independent" of federal law and "adequate" to forever bar

22   federal review.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 (1991).  To be "independent," the

23   state law basis for the decision must not be interwoven with federal law.  <u>Michigan v. Long</u>, 463

24   U.S. 1032, 1040-41 (1983).  In order to be "adequate," the state procedural bar must be "clear,

25   consistently applied, and well-established at the time of the petitioner's purported default."

26   <u>Calderon v. Bean</u>, 96 F.3d 1126, 1129 (9th Cir. 1996).

27   _____

28         [5] Respondent contends that citation to these two cases is an indication that the claims were not
     pled with sufficient particularity.  (Ans. Mem. [ECF 36-1] at 16-20.)

1    "[A] procedural default does not bar consideration of a federal claim on either direct or

2    habeas review unless the last state court rendering a judgment in the case clearly and expressly

3    states that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263

4    (1989) (internal quotation marks omitted).  A state court order which denies numerous claims

5    with citations to numerous procedural bars, but which is ambiguous as to which bars apply to

6    which claims, does not support a procedural default unless all the procedural bars are adequate

7    and independent.  Koerner v. Grigas, 328 F.3d 1039, 1051-54 (9th Cir. 2003).  Additionally, a

8    procedural default does not arise where a state court erroneously applies a state procedural rule.

9    Sivak v. Hardison, 658 F.3d 898, 907 (9th Cir. 2011); see also Lee v. Kemna, 534 U.S. 362, 375

10   (2002) (holding there are "exceptional cases in which exorbitant application of a generally sound

11   rule renders the state ground inadequate to stop consideration of a federal question.").

12        Respondent has the initial burden of pleading, as an affirmative defense, that Petitioner's

13   failure to satisfy a state procedural rule forecloses federal habeas review.  Bennett v. Mueller,

14   322 F.3d 573, 586 (9th Cir. 2003).  The burden then shifts to Petitioner to challenge the

15   independence or adequacy of the procedural bar.  Id.  If Petitioner makes a sufficient showing,

16   then the ultimate burden of proof falls on Respondent.  Id.

17                        **1. Third State Supreme Court Habeas Petition**

18        As set forth above, Petitioner's Third [Final] State Supreme Court Habeas petition raised

19   approximately two-thirds of the claims presented in the instant petition.  The claims raised in the

20   Third [Final] State Supreme Court Habeas petition had been previously denied on the merits in

21   the appellate court:

22   //

23   //

24   //

25   //

26   //

27   //

28   //

| Claim Category | Claims Raised | Claims Not Raised |
|---|---|---|
| Error by the Trial Judge | 3, 11, 29(b), 30, 32(b), 35(a), 41, 44, 49, 50, 54, 57, 59, 61, 62, 63, 64, 65, 67, 71, 74 | 22, 25, 26, 28, 38, 42, 45, 48(a), 52, 55 |
| IAC - Appellate Counsel | 47(b) | 31 |
| IAC - Trial Counsel | 4, 5, 6, 7, 8, 9, 12, 13, 14, 15, 16, 17, 18, 19, 27, 46, 53, 56, 58, 66, 68, 75 | 10, 20, 23(b), 47(a), 48(b), 51 |
| Instructional Error | | 33, 34, 35(b), 36, 37, 39, 40, 43 |
| Prosecutorial Misconduct | 2, 21, 23(a), 24, 29(a), 32(a), 60, 69, 70, 72, 73 | |

The Third [Final] State Supreme Court Habeas petition petition was denied by the state supreme court with an order stating: "The petition for writ of habeas corpus is denied. (See *In re Clark* (1993) 5 Cal.4th 750, 767-769.)." (Lodgment No. 22 [ECF No. 37-29], In re Davis, No. S213698, order at 1.) The citation to pages 767-69 of the Clark opinion is a reference to a state rule against repetitious and piecemeal litigation of claims. See Clark, 5 Cal.4th at 767-69.

Respondent contends that California's rule against repetitious and piecemeal litigation constitutes an adequate and independent state procedural ground which precludes federal habeas review. (Ans. Mem. [ECF 36-1] at 18-19.) The case citations provided by Respondent in support of that argument, however, are insufficient to support such a finding. (Id. at 19, citing Fields v. Calderon, 125 F.3d 757, 763-65 (9th Cir. 1997) (holding that California's "Dixon rule [that habeas corpus cannot serve as a substitute for appeal] is not an adequate state ground to bar federal review of Fields' defaulted claims.") and Arroyo v. Curry, 2009 WL 723877 at *6 (N.D. Cal. Mar. 18, 2009) (unpublished memorandum).) Respondent has failed to carry the initial burden of showing that the procedural bar against repetitious and piecemeal litigation of claims was well-established and consistently applied at the time of Petitioner's purported default. On the contrary, the case cited by the California Supreme Court in denying Petitioner's writ of habeas corpus, In re Clark (1993) 5 Cal.4th 750, 767-769, as well as the case relied upon by Respondent, Fields v. Calderon, 125 F.3d 757, 763-65, discuss the extent to which the

1   repetitious and piecemeal litigation bar has not been consistently applied.  Respondent has come

2   forward with nothing to demonstrate that the bar has been consistently applied since In re Clark

3   was decided.[6]

4       "Before we can apply AEDPA's standards, we must identify the state court decision that

5   is appropriate for our review.  When more than one state court has adjudicated a claim, we

6   analyze the last reasoned decision."  Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005),

7   citing Ylst, 501 U.S. at 803-04 ("Since a later state decision based upon ineligibility for further

8   state review neither rests upon procedural default nor lifts a pre-existing procedural default, its

9   effect upon the availability of federal habeas is nil-which is precisely the effect accorded by the

10  'look-through' presumption."); Koerner v. Grigas, 328 F.3d at 1053 ("A claim cannot be both

11  previously litigated and procedurally defaulted; . . .  When either ground is a possibility, the

12  choice between them is wholly arbitrary.  It is not our role to make such a choice.")  As to the

13  Third [Final] State Supreme Court petition, the last reasoned decision is the appellate court

14  order, the supreme court denied the ineffective assistance of counsel claims on the basis that

15  Petitioner had shown neither deficient performance nor prejudice under the standards announced

16  in Strickland v. Washington.  The supreme court denied the remaining claims on the basis that

17  even accepting the conclusory allegations as true, he was not prejudiced by any alleged error.

18  (Lodgment No. 13 [ECF No 37-18], In re Davis, No. D064132, order at 1-2.)  The Court finds

19  the appellate court's order to be an adjudication on the merits of the claims for AEDPA

20  purposes.  Barker, 423 F.3d at 1091-92; Koerner, 328 F.3d at 1049-53.

21              **2. Second State Supreme Court Habeas Petition**

22      Respondent has also failed to carry the burden of showing the second state supreme court

23  order supports a procedural default.  Petitioner presented his jury instruction claims (Claims 33-

24  34, 35(b), 36-37, 39-40 and 43) for the first and only time to any state court in the Second State

25  _____

26      [6] The Court, in the unpublished memorandum decision cited by Respondent, Arroyo v. Curry,
    2009 WL 723877 at *6 (N.D. Cal. Mar. 18, 2009) determined that respondent in that case had
27  "adequately pled" the bar without the respondent having established that the bar against repetitious and
    piecemeal litigations had been consistently applied since In re Clark, and thus that Court found that
28  respondent had met its initial burden.  In the instant case, this Court determines that Respondent has not
    bet its initial burden without making such a showing of consistent application.

Supreme Court Habeas petition (Supplemental Lodgment No. 1 [ECF No. 45-1] at 16-35, 38-47, 53-54); presented the ineffective assistance of appellate counsel claim presented here as Claim 31 (id. at 1-11); and presented the trial court error claims presented here as Claims 11, 30, 32(b), 35(a), 38, 42, 49-50, 63, 65, 67 and 71 (id. at 12-15, 36-37, 48-52).

| Claim Category | Claims Raised | Claims Not Raised |
|---|---|---|
| Trial Error - Gen | 11, 30, 32(b), 35(a), 38, 42, 49-50, 63, 65, 67 and 71 | 3, 22, 25-26, 28, 29(b), 41, 44-45, 48(a), 52, 54-55, 57, 59, 61-62, 64 and 74 |
| Trial Error - Instructions | 33-34, 35(b), 36-37, 39-40 and 43 (All) | |
| IAC - Trial Counsel | | |
| IAC - Appellate Counsel | 31 | 47(b) |
| Prosecutorial Misconduct | | All |

That petition was denied with an order which stated in full: "The petition for writ of habeas corpus is denied.  (See *In re Clark* (1993) 5 Cal.4th 750, 767-769; *People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Waltreus* (1965) 62 Cal.2d 218, 225; *In re Dixon* (1953) 41 Cal.2d 756, 759; *In re Swain* (1949) 34 Cal.2d 300, 304; *In re Lindley* (1947) 29 Cal.2d 709, 723; *In re Miller* (1941) 17 Cal.2d 734, 735.)  [¶]  Werdegar, J., was absent and did not participate." (Supplemental Lodgment No. 2 [ECF No. 45-2], In re Davis, No. S210668, order at 1.)

Respondent has not carried the burden of proof regarding procedural default with respect to that order because: (1) the state supreme court did not indicate which of the procedural bars applied to which claims; (2) Respondent does not argue that the Duvall citation represents an adequate and independent state procedural bar (but merely argues it means the claims are unexhausted): and (3) a Waltreus citation does not support a procedural default.  Ylst, 501 U.S. at 805 (observing with respect to California's Waltreus rule: "Since a later state decision based upon ineligibility for further state review neither rests upon procedural default nor lifts a pre-existing procedural default, its effect upon the availability of federal habeas is nil . . .");

<u>Washington v. Cambra</u>, 208 F.3d 832, 834 (9th Cir. 2000) (holding that when the operative state court order invokes more than one procedural bar but fails to specify which rule applies to which claim, the order does not bar federal review unless all of the state procedural bars are adequate and independent).

The jury instruction claims - Claims 33-34, 35(b), 36-37, 39-40 and 43 - were not presented to any other state court and were not adjudicated on the merits in state court. However, Respondent has failed to carry the burden of alleging they are procedurally defaulted. Similarly, Claims 38 and 42, which were presented in that Second State Supreme Court Habeas petition, and Claims 18, 31 and 46, which were presented in the Third State Supreme Court Habeas petition but not in the First Appellate Court Habeas petition, were never adjudicated on the merits in state court. A de novo review of the record is required with respect to such claims. <u>Pirtle</u>, 313 F.3d at 1167-68. However, some of Petitioner's claims overlap and the state appellate court adjudicated the merits of some claims which are closely related to claims which were denied on procedural grounds. Accordingly, to the extent the state court's reasoning is relevant, it must be considered by this Court under any standard of review. <u>Frantz</u>, 533 F.3d at 738 (holding that even if the state court does not address the constitutional issue, where the reasoning of the state court is relevant to resolution of the constitutional issue, that reasoning must be part of a federal habeas court's consideration even under a de novo review).

Respondent next contends that the claims presented in the two trial court habeas petitions are procedurally defaulted because they were thereafter presented in the Third [Final] State Supreme Court Habeas petition, which was denied with a <u>Clark</u> citation representing the state bar on repetitious and piecemeal presentation of claims. (Ans. Mem. [ECF 36-1] at 20-23.) Respondent has not carried the burden of proof required to show the claims presented to the trial court - which were later presented to the appellate and supreme courts - are procedurally defaulted for the reasons set forth above. However, as detailed above, the claims of ineffective assistance of counsel - raised here as Claims 47(a), 47(b), 48(b) - and a claim of trial court error - raised here as Claim 55 - were presented to the trial court in those two state petitions but to no other state court thereafter. Claim 45 was never presented to any state court. Although these

claims were not presented to the state supreme court, Respondent does not argue they are procedurally defaulted.[7]

### 3. First State Supreme Court Petition

Finally, Respondent contends that the claims presented in Petitioner's First State Supreme Court Habeas petition, filed while the Direct Appeal was pending, are procedurally defaulted. (Ans. Mem. [ECF 36-1] at 15-16.)  Petitioner presented in that petition, as relevant to the procedural default analysis, Claims 10, 26, 28 and 48(a), which were thereafter presented to the state court again only in the First Trial Court Habeas petition.  Petitioner also presented Claims 22 and 25, which were not presented to any other state court, and Claims 38 and 42, which were thereafter presented only in the Second State Supreme Court Habeas petition.  (Lodgment No. 16 [ECF No. 37-21] at 3-66.)  The court denied the First State Supreme Court Habeas petition with an order stating: "The petition for writ of habeas corpus is denied.  (See *People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Swain* (1949) 34 Cal.2d 300, 304; *In re Dixon* (1953) 41 Cal.2d 756, 759; *In re Lindley* (1947) 29 Cal.2d 709, 723.)."  (Lodgment No. 17 [ECF No. 37-22], *In re Davis*, No. S202405, order at 1.)

//

//

//

//

//

//

---

[7]  Although Respondent argues these claims are unexhausted because they were never presented to the state supreme court, Respondent has not argued they are procedurally defaulted for that reason.  Respondent has waived the affirmative defense of procedural default on this basis by failing to raise it in the Answer.  Trest v. Cain, 522 U.S. 87, 89 (1997).  Although the Court has discretion to raise a procedural default issue sua sponte where "to do so serves the interests of justice, comity, federalism, and judicial efficiency," Windham v. Merkle, 163 F.3d 1092, 1100 (9th Cir. 1998), the Court declines to do so because Respondent maintains that Petitioner has state court remedies available, and because under a de novo review these claims are clearly without merit.  See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same.");  Acosta-Huerta, 7 F.3d at 142 (holding that a district court can deny a claim which has not been presented to the state court if it does not present a colorable claim for relief).

| Claim Category | Claims Raised | Claims Not Raised |
|---|---|---|
| Trial Error - Gen | 3, 11, 22, 25, 26, 28, 29(b), 30, 35(a), 38, 41, 42, 48(a), 49, 50, 54, 59, 62, 64, 67, 71 | 32(b), 44, 45, 52, 55, 57, 61, 63, 65, 74 |
| Trial Error - Instruction | | 33, 34, 35(b), 36, 37, 39, 40, 43 |
| IAC - Trial Counsel | 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 23(b), 27, 46, 53, 56, 66, 68, 75 | 47(a), 48(b), 51, 58 |
| IAC - Appellate Counsel | | 31, 47(b) |
| Prosecutorial Misconduct | 2, 21, 23(a), 24, 29(a), 60, 69, 72, 73 | 32(a), 70 |

Respondent argues that the <u>Lindley</u> and <u>Dixon</u> citations by the state supreme court in that order are adequate and independent, but does not so argue with respect to the <u>Duvall</u> and <u>Swain</u> citations.  (Ans. Mem. [ECF 36-1] at 15-18.)  Thus, Respondent has not carried the burden of showing the first state supreme court order supports a procedural default as to Claims 10, 22, 25-26, 28, 38, 42 and 48(a).  <u>See</u> <u>Washington</u>, 208 F.3d at 834 (holding that when the operative state court order invokes more than one procedural bar but fails to specify which rule applies to which claim, the order does not bar federal review unless all of the state procedural bars are adequate and independent).

**d) conclusion**

In sum, the Court finds that the exhaustion requirement has been satisfied as to all claims, and that Respondent has not carried the burden of establishing any claim is procedurally defaulted.  The Court finds that all of the prosecutorial misconduct claims - presented here as Claims 2, 21, 23(a), 24, 29(a), 32(a), 60, 69-70 and 72-73 - and all the trial court error claims - presented here as Claims 3, 11, 29(b), 30, 32(b), 35(a), 41, 44, 49-50, 54, 57, 59, 61-65, 67, 71 and 74 - were denied by the state appellate court on the basis that even accepting the conclusory allegations as true, Petitioner was not prejudiced by any alleged error.  The Court will subject that adjudication to AEDPA review with respect to those claims.  The Court finds that all of the

ineffective assistance of counsel claims - presented here as Claims 4-9, 12-17, 19, 27, 53, 56, 58, 66, 68 and 75 - were denied by the state appellate court on the basis that Petitioner has shown neither deficient performance nor prejudice under <u>Strickland</u>.  The Court will subject that adjudication to AEDPA review with respect to those claims.  With respect to Claims 10, 18, 20, 22, 23(b), 25-26, 28, 31, 33-34, 35(b), 36-40, 42-43, 46, 47(a), 47(b), 48(a), 48(b), 51-52 and 55, which were denied in state court on the basis of procedural bars, and Claim 45, which was never presented to any state court, the Court will conduct a de novo review.

## 2.    Prosecutorial Misconduct

Petitioner alleges in Claims 2, 21, 23(a), 24, 29(a), 32(a), 60, 69-70 and 72-73, that his federal Constitutional right to due process was violated by prosecutorial misconduct in numerous respects.  (FAP [ECF No. 13] at 3-11.)  For the following reasons, it is clear that the state appellate court's denial of these claims, on the basis that even accepting Petitioner's conclusory allegations as true he has not shown he was prejudiced by any alleged error, is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

"To constitute a due process violation, prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  <u>Greer v. Miller</u>, 483 U.S. 756, 765 (1987), quoting <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985) (internal quote omitted).  The alleged misconduct must be reviewed in the context of the entire trial.  <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).

Petitioner alleges in Claims 2 and 23(a) that the prosecutor improperly introduced evidence Petitioner was remodeling his bathroom in order to rebut defense evidence he had injured his arm in a bicycle accident; withheld evidence that the police observed that his bathroom was not being remodeled when his house was searched; and improperly argued to the jury that he was physically able to exit the store through the hole in the bathroom ceiling and escape from the roof via the exterior fire evacuation ladder, and thereby commit the crime by himself.  (FAP [ECF No. 13] at 3-4, 9; Supp. Travers [ECF No. 42] at 17, 38.)  Evidence that

Petitioner was remodeling his bathroom around the time of the robbery was provided through cross-examination of defense witness Socorro Hernandez, who Petitioner identifies as his fiancé. Hernandez testified they lived together in the house they were purchasing around the time of Petitioner's arrest, and that Petitioner had injured his arm in a bicycle accident two or three years before his arrest.  (RT 492-95.)  The lead detective in the case, Officer Preston, testified for the prosecution that he searched the house pursuant to a search warrant, and was cross-examined by defense counsel regarding the search.  (RT 368, 375-79, 394-95.)  Petitioner has not shown that any observations regarding the bathroom, if they existed, were withheld by the prosecution, in that Officer Preston testified and was available for cross-examination.  However, even assuming Petitioner's fiancé testified falsely that he had been remodeling the bathroom around the time of his arrest, or mistakenly testified regarding the timing of the remodel, and assuming he had not merely finished the project by the time his house was searched, and further assuming the prosecution was in possession of evidence the bathroom was not being remodeled when the house was searched but did not turn that evidence over after Hernandez testified near the end of trial, the prosecutor mentioned the remodel in closing argument only briefly in the context of other evidence of Petitioner's physical condition.  (RT 555.)  That reference was made in reply to defense counsel's closing argument that Petitioner had not escaped through the roof carrying stolen goods in his prior offenses, and that it made no sense that, if he correctly understood the prosecutor to be arguing that Petitioner was assisted in the crime by the two Hispanic men who were seen in the area acting suspiciously, that they would have chosen Petitioner, the older man, to climb up through the bathroom ceiling carrying a bucket of jewelry rather than have one of the younger men do that job.  (RT 544-45.)

When reviewed in the context of the entire trial, which included evidence that Petitioner climbed ladders and carried tools at work even after he had injured his arm in a bicycle accident, Petitioner has not alleged misconduct, much less misconduct of sufficient significance to result in the denial of his right to a fair trial, stemming from his fiancé's testimony on cross-examination that he was remodeling his bathroom around the time of his arrest, by any failure to turn over any potential evidence showing the bathroom was not being remodeled when the

house was searched, or the brief rebuttal argument that Petitioner's ability to remodel his bathroom was evidence of his physical ability to commit the crime. <u>Greer</u>, 483 U.S. at 765; <u>Bagley</u>, 473 U.S. at 676; <u>Donnelly</u>, 416 U.S. at 643.

Petitioner also alleges the prosecutor improperly argued that he escaped down the exterior ladder before the police responded. (Supp. Travers [ECF No. 42] at 17, 39.)  The testimony of Taylor and Hyde that they did not activate the alarm and call the police until after they heard the robber exit through the bathroom and heard footsteps running on the roof (RT 95, 112-13, 196-97) permitted the prosecutor to argue that the jury could draw a reasonable inference Petitioner had fled across the roof and down the exterior ladder before the police arrived. <u>United States v. Gray</u>, 876 F.2d 1411, 1417 (9th Cir. 1989) ("[P]rosecutors are free to argue reasonable inferences from the evidence.")

Petitioner alleges in Claims 29(a) and 72 that the prosecutor withheld evidence regarding the two suspicious Hispanic males who were seen in the area before and after the robbery, which he contends was particularly prejudicial because, in his opinion, the robbery required more than one person.[8]  (FAP [ECF No. 13] at 22; Supp. Travers [ECF No. 42] at 145-49.)  Evidence was presented at trial that city workers had reported seeing two suspicious Hispanic men in the area, that witnesses reported seeing men flee past a dumpster in the alley behind the store where a pair of white latex gloves were found, and that Mr. Bleeth, a man working next door to the jewelry store, had seen two suspicious Hispanic men in the area the night before the robbery.  (RT 162-65, 168-77, 389-91.)  The lead detective testified that he interviewed the witnesses but the investigation was unproductive due to a lack of specific information which could be used to identify the Hispanic men.  (RT 390-91.)

Petitioner presents a copy of a police summary of the investigation which reflects that witnesses told the police that two men with backpacks were seen walking from the train station

---

[8]  As an example of Petitioner's overlapping claims, Claim 29 contains an allegation of prosecutorial misconduct in failing to disclose evidence and incident reports regarding the suspicious men seen fleeing the scene (Claim 29(a)), which was denied on the merits in state court, and an allegation of error by the trial judge in excluding witnesses and incident reports regarding those men (Claim 29(b)), which was denied on procedural grounds in the state court.

with empty bags, and later toward the station with full bags, and that a possible suspect had been seen leaving the area prior to the search.  (FAP Ex. G [ECF No. 13-3] at 33-38.)  Petitioner appears to speculate, based on the police summary, that reports of those witness statements must exist but were withheld.  The denial by the state court, on the basis that these conclusory allegations do not provide a basis for relief, is not based on an unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Speculative and conclusory allegations do not provide a basis for habeas relief.  Blackledge v. Allison, 431 U.S. 63, 74 (1977); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).  Equally meritless, for the same reasons, are the speculative and conclusory allegations in Claims 24, 32(a) and 60 that the prosecutor did not establish a chain of custody for the forensic evidence and withheld evidence of the store's layout, the mask, video images, the disconnection of the motion detector, sounds picked up by the surveillance system, specifications of the roof hole, footprint and fingerprint testing of the bathroom sink and the jewelry bucket lid, transmissions during the alarm activation, and an alarm technician who entered the crawlspace.  (FAP [ECF No. 13] at 9, 11, 19, 21-22.)

Petitioner alleges in Claim 70 that it was improper for the prosecutor to introduce evidence that the diamond he pawned about three weeks after the robbery was similar to a diamond taken in the robbery.  (FAP [ECF No. 13] at 22; Supp. Travers [ECF No. 42] at 109, 139-42.)  Although evidence was presented at trial that, absent a laser inscription, there could be no positive identification of a loose diamond, evidence was presented that the pawned diamond was similar in rare qualities of cut, clarity and carat weight to a diamond in a ring stolen in the robbery, and that removing a gem from a setting is an effective way to avoid identification.  (RT 296-98, 393, 398, 428-34.)  Petitioner has not established  misconduct in the introduction of such relevant and admissible evidence, much less misconduct of sufficient significance to result in the denial of his right to a fair trial.  Greer, 483 U.S. at 765; Bagley, 473 U.S. at 676; Donnelly, 416 U.S. at 643.

The allegations in Claims 21, 69 and 73, that the prosecutor elicited false testimony from the trial witnesses because their testimony conflicted in some respects with police reports and

the layout of the crime scene, and withheld evidence of observations by the first responders, rely on Petitioner's opinions regarding what the witnesses should have observed, and speculation that their testimony appears inconsistent with the laws of physics.  (FAP [ECF No. 13] at 8; Supp. Travers [ECF No. 42] at 36, 39, 102-15, 137-38.)  Because these claims are speculative and conclusory, the state court denial on the basis that they are conclusory, but even if true do not provide a basis for relief, is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Blackledge, 431 U.S. at 74; James, 24 F.3d at 26.

Accordingly, the Court finds that the state court adjudication of Petitioner's prosecutorial misconduct claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The Court therefore **RECOMMENDS** habeas relief be **DENIED** as to Claims 2, 21, 23(a), 24, 29(a), 32(a), 60, 69-70 and 72-73.

### 3.    Errors by the Trial Judge

Petitioner alleges in Claims 3, 11, 22, 25-26, 28, 29(b), 30, 32(b), 35(a), 38, 41-42, 44-45, 48(a), 49-50, 52, 54-55, 57, 59, 61-65, 67, 71 and 74, that his federal Constitutional right to due process was violated by numerous errors of the trial judge.  (FAP [ECF No. 13] at 3-23.)  As set forth above, Claims 3, 11, 29(b), 30, 32(b), 35(a), 41, 44, 49-50, 54, 57, 59, 61-65, 67, 71 and 74 were denied on the merits in state court on the basis that the conclusory allegations supporting the claims, even if true, do not demonstrate that Petitioner was prejudiced as a result of any alleged error.  As explained below, that denial is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  The Court also concludes, under de novo review, that habeas relief is unavailable as to Claims 22, 25-26, 28, 38, 42, 45, 48(a), 52 and 55, which were not adjudicated on the merits in state court, because the allegations, even if true, do not demonstrate a federal due process violation.

Petitioner alleges in Claims 3 and 64 that the trial judge limited defense inquiry regarding the suspicious individuals seen in the area of the jewelry store, and admonished the jurors not to consider that evidence, when he sustained a hearsay objection to Officer Winters' testimony

as to what he had been told by other officers as to what they had been told by witnesses regarding the suspicious men seen in the area.  (FAP [ECF No. 13] at 4, 10, 20; Supp. Travers [ECF No. 42] at 18, 124-25.)  He alleges in Claim 29(b) that the trial judge excluded incident and witness reports regarding the suspects seen fleeing the area.  (FAP [ECF No. 13] at 10.)

Officer Winters, when asked by defense counsel on cross-examination if the reason he was interested in the pair of white latex gloves found under the dumpster was because he had been informed that suspects might have traveled past the dumpster from the jewelry store, responded that another officer had been contacted by city employees who said they had seen people in that area.  (RT 168-69.)  The trial judge sustained the prosecutor's hearsay objection, and instructed the jurors that, "as far as the information regarding the suspects, you are to receive that only for the purpose of assisting your understanding as to why the officer investigated and acted in the way that he did.  Okay.  Not necessarily for the truth that there were suspects in and around the area.  Okay?"  (RT 168.)  A similar instruction was given in the context of the court sustaining the prosecutor's hearsay objection to defense counsel's question asking Officer Winters to confirm that there had been no reports of an African-American man seen in the area at the time of the crime, but that there *had* been reports of two Hispanic men in the area.  (RT 174-76.)  However, no such limiting instruction was given when Officer Preston, the lead detective on the case, testified regarding a statement by Mr. Bleeth, who worked next to the jewelry store, that he saw two suspicious Hispanic men in the area around 9:00 p.m. the night before the robbery.  (RT 389-91.)  Neither was such an objection sustained or an admonishment given when Officer Preston testified about information given to Officer Winters that city workers had reported seeing two Hispanic men in the alley behind the jewelry store with backpacks hiding behind trees or bushes moments after the robbery.  (Id.)  Thus, there is no support for Petitioner's allegations that the admonition to the jury regarding Officer Winters' testimony prevented the jury from considering that evidence.  Similarly, his allegations that the trial judge excluded incident and witness reports regarding the suspects seen fleeing the area are conclusory, as Petitioner does not indicate what information was excluded.

Generally, claims based on state evidentiary rulings are not cognizable in a federal habeas proceeding.  Cases in the Supreme Court "have long proceeded on the premise that the Due Process Clause guarantees the fundamental  elements of fairness in a criminal trial" but "it has never been thought that such cases establish [that] Court as a rule-making organ for the promulgation of state rules of criminal procedure," including evidentiary rules.  Spencer v. Texas, 385 U.S. 554, 563-64 (1967).  The Ninth Circuit has held that violations of state evidentiary rules may support a habeas claim if  the admission or exclusion of the evidence was so prejudicial that it rendered a trial fundamentally unfair.  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996) ("While a petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial'"); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991) ("While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.").  The state court adjudication of Claims 3, 29(b) and 64, on the basis that Petitioner was not prejudiced by the trial judge instructing the jurors to consider the testimony of Officer Winters only to explain police investigatory actions and not necessarily for the truth of whether suspects were seen in the area, is, in light of Officer Preston's more detailed testimony on that subject, to which no such admonishment was given, neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.

Petitioner alleges in Claims 11, 44, 55, 67 and 74, that the trial court erroneously allowed introduction of his prior convictions and hearsay testimony that he waived his Miranda rights during the investigation of the prior convictions, because the prior convictions were irrelevant and prejudicial.  (FAP [ECF No. 13] at 6, 14, 18, 21 and 23; Supp. Travers [ECF No. 42] at 26, 72-73, 83, 150-59.)  The three prior convictions all involved admissions by Petitioner that he cased a business to observe the alarm system, constructed a hole in the roof of the business, and initially blamed the crimes on an unnamed Hispanic man.  (RT 253-67.)  In two of those crimes

he entered through the roof hole, confronted and robbed employees at gunpoint after they disabled the alarm system, and left items behind.  (Id.)   Neither the relatively minor dissimilarities Petitioner points out, such as escaping through a door rather than the roof and construction details regarding how the holes were built, nor his objection to the admission of Detective McDonough's hearsay testimony that Petitioner waived his <u>Miranda</u> rights before admitting to the crimes, supports a finding that the admission of his prior convictions rendered his trial fundamentally unfair.  Also, there is no merit to his contention that he was convicted only because of the prior convictions, as his DNA was found on the mask and gun found in the crawlspace and evidence was presented that three weeks after the robbery he pawned a diamond similar to a diamond taken in the robbery.  Furthermore, it is notable that the jury requested a readback not just of Detective McDonough's testimony regarding the prior convictions, but the testimony of victim Hyde and DNA expert Chang as well.  The state court denial of Claims 11, 44, 67 and 74 is not based on an unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is relevant to this Court's de novo review of Claim 55, which the Court concludes fails to allege a federal due process violation.  <u>Estelle</u>, 502 U.S. at 70-73; <u>Ortiz-Sandoval</u>, 81 F.3d at 897; <u>Jammal</u>, 926 F.2d at 919-20.

Petitioner alleges in Claim 45, the only claim presented here that was not presented to any state court, that the trial court failed to require proof that the taking element of robbery occurred at the same time as the force or fear element.  (FAP [ECF No. 13] at 14.)  In California, "robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  Cal. Penal Code § 211.  The evidence showed that Taylor and Hyde were subdued at gunpoint while the robber took jewelry from the safe and escaped.  Based on a de novo review, Petitioner's contention that the force or fear element of robbery did not exist when the property was taken is without merit.  <u>See</u> <u>People v. Gomez</u>, 43 Cal.4th 249, 257 (2008) (recognizing that "property may be found to be in the victim's immediate presence even though it is located in another room of the house, or in another building on the premises.") (internal quotation marks omitted).

Petitioner alleges in Claim 61 that the trial judge denied him his right to allocution at sentencing. (FAP [ECF No. 13] at 19; Supp. Travers [ECF No. 42] at 116-17.) Petitioner does not indicate, here or in the state court, what he would have said had he been given the opportunity. (FAP [ECF No. 13] at 19; Lodgment No. 12 [ECF No. 37-16] at 22-23.) He did, however, submit two pro se post-trial motions which the trial judge reviewed and found to be comprehensive. (RT 585-86, 600; CT [ECF No. 37-1] at 141-50.) Defense counsel made an impassioned plea for the trial court to strike Petitioner's priors and spare him from the requirements of the Three Strikes law based on the staleness of his prior convictions, and his lack of criminal conduct after being released from incarceration on the prior convictions detailed at trial, to which he pleaded guilty after volunteering information to the police. (RT 586-88; CT [ECF No. 37-1] at 134-40.) The prosecutor pointed out that two of Petitioner's six prior convictions involved armed robberies with real guns, one involved a home invasion robbery where he pointed a gun at the occupants, and one involved arson where Petitioner threw two "Molotov Cocktails" into his ex-wife's apartment which started a fire in the bedroom where his three-year-old son was sleeping. (RT 588-90; Lodgment No. 5 [ECF No. 37-8], People v. Davis, No. D060030, slip op. at 14-15.) Taylor and Hyde both provided victim impact testimony describing the terror and vulnerability they felt that day, and their continuing loss of a sense of safety and well being. (RT 591-91; Lodgment No. 5 [ECF No. 37-8], People v. Davis, No. D060030, slip op. at 16.) The trial judge gave a lengthy explanation as to why he found the Three Strikes law "is exactly the type of law that addresses this type of person." (RT 597-601.) Petitioner has not shown that anything he might have said at sentencing would have affected his sentence, and the adjudication of this claim by the state court on the basis that Petitioner has not shown he was prejudiced as a result of the alleged error is objectively reasonable. See United States v. Mejia, 953 F.2d 461, 468 (9th Cir. 1991) (denial of right of allocution was harmless because it would not have affected sentence).

Petitioner alleges in Claim 62 that the trial judge ordered that a June 16, 2011, hearing (at which sentencing was continued until June 28, 2011) not be transcribed as part of the record. (FAP [ECF No. 13] at 20; Supp. Travers [ECF No. 42] at 118-20.) The trial minutes indicate

that the jury verdicts were returned on May 18, 2011, Petitioner admitted the truth of the prior conviction allegations on May 19, 2011, and sentencing was set for June 16, 2011. (CT [ECF No. 37-1] at 187-89.) On June 16, 2011, Petitioner was present when the trial judge continued the sentencing hearing to June 28, 2011. (CT [ECF No. 37-1] at 190.) The minute order states: "The court finds good cause to continue over the objection of the defendant. The court finds it in the best interest of the defendant. Victims not present today." (Id.) Petitioner claims that granting the continuance because the victims were not present to provide victim impact testimony, rather than being in his best interest, prejudiced him because the victims provided strong testimony at the June 28 sentencing hearing regarding the psychological and financial harm they suffered as a result of the robbery. However, Petitioner does not indicate how he was prejudiced by a lack of transcription of the hearing. Thus, he fails to show that the determination by the state court that the allegations supporting this claim do not provide a basis for finding prejudice, is contrary to, or an unreasonable application of, clearly established federal law, or is based on an unreasonable determination of the facts.

Petitioner alleges in Claim 48(a) that the trial judge imposed a restitution fine based on an improper valuation of the jewelry store owner's loss. (FAP [ECF No. 13] at 16; Supp. Travers [ECF No. 42] at 70-71.) This Court lacks jurisdiction to consider that claim. Bailey v. Hill, 599 F.3d 976, 979-80 (9th Cir. 2010) ("§ 2254 does not confer jurisdiction over a state prisoner's in-custody challenge to a restitution order imposed as part of a criminal sentence.").

Petitioner alleges in Claims 49-50, 52, 57, 59 and 65, that the trial judge erroneously allowed the introduction of DNA evidence because the calculation of the probability of a match considered only the African-American population, the DNA evidence was unreliable, and there was no evidence of how his DNA got on the items found at the crime scene. (FAP [ECF No. 13] at 10, 16-20; Supp. Travers [ECF No. 42] at 15, 56, 72-76, 78.) He alleges in Claims 30, 41 and 71, that the trial judge allowed a conviction based on insufficient evidence. (FAP [ECF No. 13] at 11, 13, 22; Supp. Travers [ECF No. 42] at 16, 45, 56, 99-101, 126-27, 129-31, 143-44.) These claims do not provide a basis for relief for the reasons set forth above in Claim 1.

Petitioner alleges in Claims 22, 25 and 42, that the trial judge abused his discretion in ruling on Petitioner's pro se post-trial motions by not adequately articulating the reasons for denying them, and failed to obtain a waiver of counsel prior to addressing them.  (FAP [ECF No. 13] at 9; Supp. Travers [ECF No. 42] at 37, 40, 57.)  Petitioner argues that his motions deserved more attention, as evidenced by the trial judge's characterization of them as "comprehensive."  (Id.)  However, the arguments supporting those motions, as with the arguments supporting Petitioner's claims here, are based merely on Petitioner's unsupported and erroneous opinions as to the admissibility and strength of the evidence presented at his trial.  Based on a de novo review of the record, the Court concludes the allegations regarding the approach trial judge took to resolve the post-trial motions do not provide a basis for federal habeas relief because they are wholly conclusory and speculative.  The same is true of the allegations in Claim 26 that the trial judge was biased and unfair throughout the trial (FAP [ECF No. 13] at 10; Supp. Travers [ECF No. 42] at 41, 90-93), and in Claim 38 that the trial judge refused to accept a stipulation allowing the headband flashlight and pawn ticket to be returned to their owners after trial (FAP [ECF No. 13] at 13; Supp. Travers [ECF No. 42] at 53).

Petitioner alleges in Claim 32(b) that the trial judge failed to require a chain of custody for the forensic evidence (FAP [ECF No. 13] at 11; Supp. Travers [ECF No. 42] at 47), in Claim 35(a) that the trial judge allowed introduction of the pawn ticket although it had no probative value (FAP [ECF No. 13] at 12, 17; Supp. Travers [ECF No. 42] at 50, 74), in Claim 62 that the trial judge ordered destruction of the pair of white latex gloves after trial (FAP [ECF No. 13] at 20; Supp. Travers [ECF No. 42] at 118), in Claim 54 that the trial judge excluded defense evidence based on hearsay objections (FAP [ECF No. 13] at 14, 18; Supp. Travers [ECF No. 42] at 44, 81-82), in Claim 50 that the trial judge allowed introduction of the pawned diamond although it had no probative value (FAP [ECF No. 13] at 12, 17; Supp. Travers [ECF No. 42] at 50, 74), and in Claims 57 and 63 that the trial judge allowed introduction of irrelevant videotapes, unreliable photographs, the headband flashlight seized from the truck Petitioner was driving when arrested, and evidence that the diamond belonged to the robbery victim (FAP [ECF No. 13] at 18, 20).  The state court denial of those claims, on the basis that they relied on

conclusory allegations which, even if true, do not show that Petitioner was prejudiced, is not based on an unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable application of, clearly established federal law, which provides that state evidentiary rulings do not support federal habeas relief unless they deprived Petitioner of a fundamentally fair trial, and that speculative and conclusory allegations are insufficient to demonstrate entitlement to habeas relief. Blackledge, 431 U.S. at 74; Estelle, 502 U.S. at 70-73; Ortiz-Sandoval, 81 F.3d at 897; James, 24 F.3d at 26; Jammal, 926 F.2d at 919-20.

Accordingly, the Court **RECOMMENDS** habeas relief be **DENIED** as to Claims 3, 11, 22, 25-26, 28, 29(b), 30, 32(b), 35(a), 38, 41-42, 44-45, 48(a), 49-50, 52, 54-55, 57, 59, 61-65, 67, 71 and 74.

### 4.    Ineffective Assistance of Counsel

Petitioner alleges in Claims 4-10, 12-20, 23(b), 27, 31, 46, 47(a), 47(b), 48(b), 51, 53, 56, 58, 66, 68 and 75, that his federal Constitutional right to the effective assistance of counsel was violated due to numerous instances of deficient performance of trial and appellate counsel. (FAP [ECF No. 13] at 2-33.) As set forth above, the appellate court denied Claims 4-9, 12-17, 19, 27, 53, 56, 58, 66, 68 and 75 on the basis that the allegations did not support a finding of deficient performance of counsel, or prejudice as a result of counsel's actions, under the standard announced in Strickland v. Washington, 466 U.S. 668 (1994), and the Court will apply the provisions of 28 U.S.C. § 2254(d) to that order. The Court will conduct a de novo review of the record with respect to Claims 10, 18, 20, 23(b), 31, 46, 47(a), 47(b), 48(b) and 51, which were not adjudicated on the merits in state court.

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must show that counsel's performance was deficient. Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Petitioner must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." Id. To show prejudice, Petitioner need only demonstrate a reasonable probability that the result

of the proceeding would have been different absent the error.  Id. at 694.  A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." Id.  Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel.  Id. at 687.

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).  "The standards created by Strickland and section 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted).  These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011).  "Even under de novo review, the standard for judging counsel's representation is a most deferential one." Richter, 562 U.S. at 105.  "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." Id. at 110, quoting Strickland, 466 U.S. at 686.  Federal habeas functions as a "guard against extreme malfunctions in the state criminal justice systems," and not as a means of error correction. Id., at 102-03, quoting Jackson, 443 U.S. at 332 n.5.

Petitioner alleges in Claims 4, 14, 53, 58 and 68, that his trial counsel was deficient in stipulating to forgoing a challenge to the chain of custody of the gun and mask in order to allow an independent laboratory to test it for DNA, in failing to challenge and investigate the DNA evidence, and in failing to hire an expert witness regarding that evidence.  (FAP [ECF No. 13] at 4, 7, 17, 19, 21; Supp. Travers [ECF No. 42] at 29, 79-80, 132-36.)  Petitioner presents as an exhibit a DNA analysis report dated May 6, 2011, prior to the beginning of trial on May 9, 2011, which was prepared at the request of defense counsel with respect to DNA testing of the mask, gun, and latex gloves, confirming the presence of Petitioner's DNA on the mask and gun.  (FAP Ex. M [ECF No. 13-2] at 17-21.)  As set forth above with respect to Claim 1, Petitioner has not established that the DNA evidence was inadmissible or irrelevant.  Thus, the record supports a finding that defense counsel obtained an independent expert opinion regarding the forensic evidence, and does not support the conclusory and speculative allegations that counsel was deficient in that regard or with respect to the need to call an expert witness at trial.  Therefore,

1    Petitioner has not established that the state court denial of these claims, on the basis that the

2    allegations do not support a finding of deficient performance by counsel or prejudice as a result

3    of counsel's actions, is based on an unreasonable determination of the facts, or is contrary to, or

4    involves an unreasonable application of, the Strickland standard.

5         Petitioner alleges in Claim 5 that counsel was deficient in failing to object to his being

6    identified at the preliminary hearing by Taylor as the African-American man she saw at the

7    jewelry store about seven weeks before the robbery, because his case would not have gone to

8    trial but for that identification.  (FAP [ECF No. 13] at 4; Supp. Travers [ECF No. 42] at 20.)

9    Officer Winters testified at trial on cross-examination by defense counsel that Petitioner was not

10   the African-American man who Taylor had reported at the store seven weeks before the robbery.

11   (RT 173-74.)  The state court denied Claim 5 on the ground that Petitioner was not prejudiced

12   even if the allegation that he was falsely identified at the preliminary hearing is true.  (Lodgment

13   No. 13 [ECF No. 37-18], In re Davis, No. D064132, order at 2 (Cal.Ct.App. Aug. 13, 2013).)

14   The state court's denial of Claim 5 is thus not based on an unreasonable determination of the

15   facts, and is neither contrary to, nor involves an unreasonable application of, clearly established

16   federal law.  Strickland, 466 U.S. at 694 (holding that prejudice requires a showing of "a

17   probability sufficient to undermine confidence in the outcome" of the trial).

18        Petitioner alleges in Claim 6 that counsel failed to request discovery of telephone records

19   which could have established that he was somewhere else at the time of the crime.  (FAP [ECF

20   No. 13] at 5; Supp. Travers [ECF No. 42] at 21.)  Although unclear, he appears to contend that

21   telephone records could have established that his telephone was active elsewhere during the

22   crime (id.), but there is no showing that such records would have proven he was at any other

23   location, especially because such records only show the location of the phone, not the person.

24   The state court denial of this claim on the basis that these allegations do not support a finding

25   of deficient performance by counsel or prejudice as a result of counsel's actions, is not based on

26   an unreasonable determination of the facts, and is neither contrary to, nor involves an

27   unreasonable application of, the Strickland standard.

28

Petitioner contends in Claim 7 that trial counsel failed to file a pre-trial motion to dismiss the charges on the basis the police and victim reports identified the robber as Hispanic. (FAP [ECF No. 13] at 5; Supp. Travers [ECF No. 42] at 22.) In light of the evidence presented at trial that Petitioner spoke Spanish and had falsely identified an unnamed Hispanic man as the perpetrator of his prior similar crimes, and the testimony of one of the victims that she may have only thought the robber had an Hispanic accent because he spoke so softly, a pre-trial motion to dismiss the charges would have been futile. Thus, the state court denial of this claim on the basis that the allegations do not support a finding of deficient performance of counsel in failing to file such a motion, or prejudice from that failure, is not based on an unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable application of, the Strickland standard.

Petitioner alleges in Claim 8 that trial counsel had a conflict of interest because he or his office represented the African-American man reported at the jewelry store seven weeks before the robbery, thereby creating a reluctance to challenge the identification of Petitioner as that man at the preliminary hearing. (FAP [ECF No. 13] at 5.) This allegation is not supported by any evidence, relies on the baseless contention that the preliminary hearing identification affected his trial, and is wholly conclusory and speculative. Thus, the state court's rejection on the basis that the allegations do not support a finding of prejudice as a result of counsel's actions, is not based on an unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable application of, the Strickland standard.

Petitioner alleges in Claim 9 that counsel failed to present evidence that a defense investigator interviewed someone who worked with Petitioner who remembered that Petitioner had told him his bicycle and backpack were stolen sometime in 2009. (FAP [ECF No. 13] at 5 & Ex. T [ECF No. 13-17 at 127]; Supp. Travers [ECF No. 42] at 24.) He contends this evidence could have explained why his DNA was found at the scene, as the real robber(s) may have stolen his tools and used them to commit the crime. (Id.) Such evidence would constitute hearsay, and endeavoring to admit it would have been futile. The state court's rejection on the basis that these allegations do not support a finding of deficient performance or prejudice, is not based on an

unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Strickland, 466 U.S. at 694 (holding that prejudice requires showing "a probability sufficient to undermine confidence in the outcome" of the trial).

Petitioner alleges in Claim 10 that trial counsel should have filed a motion to suppress evidence of the pawn ticket and the pawned diamond on the basis that the diamond could not be positively identified as having been stolen in the robbery. (FAP [ECF No. 13] at 6; Supp. Travers [ECF No. 42] at 25.) As discussed above, evidence was presented that Petitioner pawned a diamond about three weeks after the robbery which was similar in rare qualities to a diamond stolen in the robbery. Because it would have been futile for trial counsel to seek to suppress such relevant and admissible evidence, a de novo review of this claim shows that Petitioner has alleged neither deficient performance nor prejudice. Richter, 562 U.S. at 105 ("Even under de novo review, the standard for judging counsel's representation is a most deferential one.").

Petitioner alleges in Claim 13 that trial counsel was deficient in failing to present medical evidence to show that his physical limitations excluded him as the robber. (FAP [ECF No. 13] at 6; Supp. Travers [ECF No. 42] at 28, 161.) He alleges he made medical records available to counsel prior to trial regarding his injured arm, but counsel did not use them, even though counsel argued to the jury in closing that Petitioner was physically unable to commit the crime. (Id.) Two defense witnesses testified that Petitioner was in a bicycle accident in which he severely injured his arm. (RT 490-91, 498-99.) Defense counsel argued to the jury in closing that Petitioner is not type of person who could jump up through the hole in the bathroom ceiling carrying a bucket of jewelry, that he had not done so in his previous crimes, and that it made no sense that Petitioner would have been the one to climb out of the hole in the bathroom ceiling carrying the jewelry, if the prosecutor's theory was that there were other, younger men also involved in the robbery. (RT 544-45.) However, there was testimony that at the time of the robbery Petitioner was climbing ladders and carrying heavy tools at his job (RT 501-02), that he had always kept himself in excellent physical condition (RT 490-91, 498-99), and had admitted

1    committing two nearly identical robberies 16 years earlier.  (RT 253-73.)  Although Petitioner

2    argues that he escaped through doors rather than the roof in those other robberies, he admitted

3    he came and went through the roof hole during his preparations for those robberies.  (RT 258-59,

4    262-65.)  In light of that evidence, and the fact that the jury was able to observe Petitioner in the

5    courtroom and observe the robber on the videotape from the store's surveillance cameras,

6    Petitioner has not shown "a probability sufficient to undermine confidence in the outcome" as

7    a result of counsel's failure to present his medical records at trial.  Strickland, 466 U.S. at 694.

8    Thus, the state court's rejection of this claim on the basis that the allegations, even if true, do not

9    support a finding of prejudice, is not based on an unreasonable determination of the facts, and

10   is neither contrary to, nor involves an unreasonable application of, the Strickland standard.

11          Petitioner alleges in Claim 56 that trial counsel believed he was guilty and therefore failed

12   to subject the prosecution's evidence to adversarial testing or spend adequate time with

13   Petitioner.  (FAP [ECF No. 13] at 18; Supp. Travers [ECF No. 42] at 19, 23, 42, 62-67, 85-89,

14   160.)  He alleges in Claim 15 that counsel failed to prepare for trial because he was overbooked

15   for the 14 months before trial, which Petitioner contends explains why he presented no defense

16   at trial.  (FAP [ECF No. 13] at 7.)  He alleges in Claim 12 that counsel failed to seek discovery

17   or present a defense, and did not advocate on behalf of Petitioner or subject the prosecution's

18   evidence to adversarial testing.  (FAP [ECF No. 13] at 6; Supp. Travers [ECF No. 42] at 27, 97-

19   98.)  Petitioner refers to a February 22, 2011, defense motion to continue the trial (CT [ECF No.

20   37-1] at 14-17), which was opposed (CT [ECF No. 37-1] at 18-21), and which was granted,

21   trailing the case to May 7, 2011 (CT [ECF No. 37-1] at 170), in which defense counsel stated:

22              On February 2nd, I met with DDA Vasel and this Court and explained that I had
            "dropped the ball" and failed to get the items that were originally tested for DNA
23          retested.  I explained that because of the cost, it had taken longer than expected
            to get the expense for retesting approved by my office and once they did, I had not
24          followed up to make sure the necessary materials had been picked up by the DNA
            laboratory that the defense had retained.  I explained that because of the nature of
25          this case, I believe that retesting was vital to allow me to provide effective
            representation to Mr. Davis.  [¶]  On that same date we discussed my upcoming
26          trial schedule.  I shared that I had upcoming trials on Feb. 10th, 23rd, two on the
            28th, March 3rd, and 7th.  I shared that I had more than fifteen cases set for trial
27          in the next several months, all of which had been through a Readiness Conference

     //
28   //

post-preliminary hearing.  I shared that the next open dates I had available to reset this case for trial was late-May 2011.

(CT [ECF No. 37-1] at 16.)

As set forth above, defense counsel confirmed though independent expert analysis that Petitioner's DNA was found on the mask and gun found at the scene.  Defense counsel presented evidence that Petitioner's arm was injured at the time of the crime.  He also presented evidence, through cross-examination of the victims and the police officers: that the robber may have spoken with an Hispanic accent; that there were no reports of any African-American men in the area around the time of the robbery; and that two Hispanic men were seen in the area the night before the robbery and in the alley behind the store immediately after the robbery, carrying backpacks and acting suspiciously, who may have run past a dumpster after the robbery where a pair of white latex gloves were found which contained DNA for which Petitioner was excluded as a donor.  In addition, defense counsel argued to the jury that it was not a coincidence that two Hispanic men were in the area at the time of the robbery, that Petitioner was not the man seen in the videotape, and it was unlikely Petitioner would have been able to escape through the hole in the roof carrying the jewelry, something he had never attempted in his past offenses, and unlikely that, if the two Hispanic men had been involved with Petitioner in the robbery, they would have chosen Petitioner, the older man, to escape with the jewelry through the bathroom ceiling. (RT 535-49.) Counsel also argued that it made no sense that if Petitioner was the robber he would keep only one stone from thousands of dollars worth of jewelry, and then show his driver's license and provide his thumb print when he pawned it, and that if he was guilty it made no sense that he would not admit guilt as he had done in the previous robberies, or run away rather than appear for trial and insist on having his day in court.  (Id.)  In light of this, the state court's denial of these claims on the basis that neither deficient performance nor prejudice had been established by the unsupported allegations that counsel was unprepared for trial, did not present a defense, did not spend an adequate amount of time with Petitioner, and did not subject the prosecution's evidence to adversarial testing, is not based on an unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable application of, the Strickland standard.

Petitioner alleges in Claim 16 that counsel failed to investigate the crime scene, and if he had, he could have shown that Petitioner could not jump up into a 24-inch hole in an 8-foot high ceiling carrying a 24-inch bucket, and then abscond across the roof without being seen.  (FAP [ECF No. 13] at 7; Supp. Travers [ECF No. 42] at 31, 163-64.)  He alleges in Claim 75 that counsel was deficient in failing to investigate the crime scene in order to argue that Petitioner lacked knowledge of the alarm system and did not possess the physical abilities needed to commit the crime.  (FAP [ECF No. 13] at 23; Supp. Travers [ECF No. 42] at 28, 38, 160-61.)  Petitioner fails to establish how an investigation of the crime scene would have allowed trial counsel to establish these things.  Evidence was presented at trial regarding how the hole was made, and that Petitioner had admitted to building similar holes in three business, two of which he used to enter and exit the premises while planning the robberies.  (RT 216-17, 258-59, 262-64.)  The allegations supporting these claims are wholly conclusory and speculative, and the state court's rejection of them on the basis that the allegations do not support a finding of prejudice as a result of counsel's actions, is not based on an unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable application of, the <u>Strickland</u> standard.

Petitioner alleges in Claim 17 that counsel failed to present evidence from Petitioner's friends, his fiancé and her children, that they "on several occasions used petitioner's resources to facilitate crimes initially unknown to petitioner," including forging checks and visas.  (FAP [ECF No. 13] at 7; Supp. Travers [ECF No. 42] at 32.)  Although unclear, Petitioner apparently contends they should have been suspected of involvement in the robbery.  (<u>Id.</u>)  Petitioner has not shown "a probability sufficient to undermine confidence in the outcome" of the trial as a result of trial counsel's failure to present such evidence.  <u>Strickland</u>, 466 U.S. at 694.  Thus, the denial by the state court is not based on an unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable application of, <u>Strickland</u>.

Petitioner alleges in Claim 18 that his trial counsel failed to investigate the reports of suspicious Hispanic men reported around the scene of the robbery, and failed to introduce that evidence at trial.  (FAP [ECF No. 13] at 8; Supp. Travers [ECF No. 42] at 34.)  The detective in charge of the investigation testified on cross-examination by defense counsel that he

investigated reports that witnesses had reported two suspicious Hispanic men in the area the night before and the morning of the crime, and had interviewed the reporting witnesses, but the investigation was unproductive due to a lack of specific information necessary to identify or locate those men.  (RT 389-91.)  Petitioner has not alleged what his trial counsel could have done to investigate those reports which was not accomplished during the police investigation, and has not identified what additional information could have been presented to the jury.  Under a de novo review, Petitioner has not alleged facts which establish either deficient performance or prejudice.

Petitioner alleges in Claim 19 that counsel failed to request incident reports in order to challenge the testimony that the motion detector in the crawlspace had been disabled, and should have insisted that testimony of an alarm company employee be used to establish that fact.  (FAP [ECF No. 13] at 8; Supp. Travers [ECF No. 42] at 33.)  Officer Winters testified that he was one of the first officers on the scene, and that he looked in the roof hole and saw a mount for a motion detector that appeared to have been removed by being kicked or pried off the wall.  (RT 161.)  The owner of the store also testified that an alarm technician who was working on the alarm system "trying to get it back up and running after all the damage that was done," told him that the wiring of the motion detector in the crawlspace above the women's bathroom had been disconnected.  (RT 403.)  Petitioner has not alleged how he was prejudiced in this respect, and the state court's rejection of this claim is not based on an unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable application of, the Strickland standard.

Petitioner alleges in Claim 20 that counsel was deficient in failing to move to suppress the admissibility of his prior convictions on the basis that the People's trial brief  presented an inaccurate factual basis for those convictions.  (FAP [ECF No. 13] at 8; Supp. Travers [ECF No. 42] at 35.)  As set forth above, the prior convictions were relevant and admissible.  This claim fails under a de novo review because Petitioner has not established a basis for a suppression motion, and has not alleged facts which, if true, establish either deficient performance or prejudice.

Petitioner alleges in Claim 23(b) that counsel was deficient in allowing false evidence to be presented that he was remodeling his bathroom before he was arrested, which was introduced to rebut evidence he had injured his arm, because: "The prosecution had images of petitioner's bathroom from the search warrant authorized prior to arrest." (FAP [ECF No. 13] at 9; Supp. Travers [ECF No. 42] at 38.) Testimony that Petitioner was remodeling his bathroom by himself around the time of his arrest was provided when the prosecutor cross-examined his fiancé after defense counsel elicited testimony from her that Petitioner had injured his arm in a bicycling accident to the point where the muscles in the arm had atrophied and were similar to those of a child. (RT 490, 493.) Petitioner has not shown that defense counsel was deficient in failing to object to the prosecutor's cross-examination, or that an objection would have been sustained. In light of the testimony of Petitioner's employer that he did not have difficulty climbing in and out of boats using ladders four to fifteen-feet long, and carrying tools and equipment weighing ten to fifty pounds, Petitioner has not shown "a probability sufficient to undermine confidence in the outcome" arising from defense counsel's failure to object to evidence he was remodeling his bathroom, or present evidence that it was not being remodeled when his house was searched. Strickland, 466 U.S. at 694.  This claim fails under a de novo review.

Petitioner alleges in Claim 27 that trial counsel intentionally delayed the trial because he knew he could not provide adequate representation, which was shown by the lack of any pre-trial motions and an inability to adequately confront the prosecution witnesses. (FAP [ECF No. 13] at 10.) He contends counsel delayed the trial for one and one-half years during which they did not adequately meet and confer, which resulted in the late receipt of the independent DNA analysis, that counsel should have filed a pre-trial motion to dismiss based on speedy trial right violation, and should have filed a pre-trial motion to suppress irrelevant and immaterial evidence such as "the pawned diamond, antedated video, and the headband flashlight." (Supp. Travers [ECF No. 42] at 42.)  The denial by the state court on the basis that these conclusory allegations do not support a finding of deficient performance or prejudice, is not based on an unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable application of, Strickland.

Petitioner alleges in Claim 47(a) that trial counsel failed to understand that the evidence showed that both of the robbery counts shared the same operative facts that the victims were assaulted before any property was taken, which obviated a robbery conviction and violated double jeopardy principles.  (FAP [ECF No. 13] at 16; Supp. Travers [ECF No. 42] at 68-69.) Petitioner's contention that a robbery did not take place because force was used against the victims before the property was taken is without merit for the reasons discussed above.  In addition, "[t]he Double Jeopardy Clause 'protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense.'" Brown v. Ohio, 432 U.S. 161, 165 (1977) (quoting North Carolina v. Pearce, 395 U.S. 711, 717 (1969) (footnotes omitted), overruled on other grounds by Alabama v. Smith, 490 U.S. 794, 802 (1989)).  Double jeopardy protections are not implicated by Petitioner's conviction on two counts of robbery, one involving victim Taylor and the other victim Hyde, where evidence was presented that he pointed a gun at both victims at different places in the store during the robbery. Under a de novo review, Petitioner has not alleged facts which establish either deficient performance or prejudice.

Petitioner alleges in Claim 48(b) that counsel was deficient in failing to object to the imposition of a $170,000 restitution fine, where evidence was presented that the out-of-pocket loss by the jewelry store owner was $84,723, and where Petitioner's ability to pay was not taken into consideration.  (FAP [ECF No. 13] at 16; Supp. Travers [ECF No. 42] at 70-71.)  Although the Court lacks jurisdiction to consider this claim, see Bailey, 599 F.3d at 979-80, the Court nonetheless notes the claim is without merit, as the record shows Petitioner was ordered to pay $30, 200 in restitution to the store owner.  (CT [ECF No. 37-1] at 191.)

Finally, Petitioner alleges in Claim 66 that his trial counsel failed to object to hearsay evidence, and in Claim 51 that counsel failed to object to testimony based on a lack of discovery. (FAP [ECF No. 13] at 17, 21; Supp. Travers [ECF No. 42] at 77, 128.)  These allegations are

1   wholly conclusory and speculative, and do not support habeas relief under any standard of

2   review.[9]

3          Petitioner alleges in Claims 31 and 47(b) that his appellate counsel provided ineffective

4   assistance for failing to review the trial record and discover claims to be presented on direct

5   appeal, including the double jeopardy claim addressed above; permitted the appellate court to

6   affirm based on irrelevant evidence; failed to understand that the evidence showed that the

7   assault occurred before the taking and therefore a robbery did not occur; and failed to challenge

8   the admissibility of the prior offenses, the DNA evidence, and the use of hearsay testimony.

9   (FAP [ECF No. 13] at 11, 16; Supp. Travers [ECF No. 42] at 46.)  The Strickland standard also

10  applies to claims of ineffective assistance of appellate counsel.  Smith v. Robbins, 528 U.S. 259,

11  285 (2000).  Because Petitioner has not identified a viable claim which appellate counsel could

12  have raised on direct appeal, habeas relief is unavailable under a de novo review of these claims.

13  Id.; see also Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982) (stating that an

14  attorney's failure to raise a meritless legal argument does not constitute ineffective assistance).

15         The Court concludes that the state appellate court's denial of the ineffective assistance

16  of counsel claims which were adjudicated on the merits in state court is not based on an

17  unreasonable determination of the facts, and is neither contrary to, nor involves an unreasonable

18  application of, clearly established federal law.  Richter, 562 U.S. 102-03; Strickland, 466 U.S.

19  at 687, 694.  The Court also concludes, under a de novo review, that habeas relief is unavailable

20  with respect to the ineffective assistance of counsel claims which were not adjudicated on the

21  merits, because Petitioner's allegations, even if true, do not satisfy the Strickland standard.

22  Richter, 562 U.S. at 105; Strickland, 466 U.S. at 687, 694.   Accordingly, the Court

23  **RECOMMENDS** that habeas relief be **DENIED** as to Claims 4-10, 12-20, 23(b), 27, 31, 46,

24  47(a), 47(b), 48(b), 51, 53, 56, 58, 66, 68 and 75.

25  //

26

27  _____

      [9]  The Court has also considered the cumulative impact of trial counsel's decisions and finds no
28  prejudice.  See Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) ("It will generally be appropriate for
      a reviewing court to assess counsel's overall performance throughout the case in order to determine
      whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable
      professional assistance."), quoting Strickland, 466 U.S. at 689.

### 5.    Instructional Errors

Petitioner alleges in his remaining claims that his federal Constitutional right to due process was violated by erroneous jury instructions. (Claims 33-34, 35(b), 36-37, 39-40 and 43.) As set forth above, these claims were not adjudicated on the merits in state court, and the Court will conduct a de novo review of the record to address them.

In order to show a federal due process violation arising from instructional error, Petitioner must demonstrate that the instruction "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72, quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973). In addition, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.

Petitioner alleges in Claims 33 and 43 that the trial court erred in instructing the jury on the intent element of robbery. (FAP [ECF No. 13] at 11, 14; Supp. Travers [ECF No. 42] at 48.) The argument presented in support of these claims is incomprehensible (id.), and there is no error apparent in the record regarding the instruction on the intent element of robbery. (RT 519-20.) Based on a de novo review, Petitioner has not alleged facts which show the jury instruction "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72.

Petitioner alleges in Claim 34 that the trial court erred in instructing the jury on reasonable doubt. (FAP [ECF No. 13] at 12; Supp. Travers [ECF No. 42] at 49.) The argument presented in support of this claim is incomprehensible (id.), and there is nothing in the record to suggest that the reasonable doubt jury instruction given at his trial (RT 509-10) was erroneous, much less "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72.

Petitioner alleges in Claim 35(b) that the trial court erred in instructing the jury regarding the pawn slip. (FAP [ECF No. 13] at 12; Supp. Travers [ECF No. 42] at 50.) Petitioner refers to the instruction that if the jury finds that Petitioner made oral or written statements before trial, they are to consider the statements along with all the other evidence, and it is up to them to

decide how much importance to give them.  (Id.; RT 517-18.)  Apparently, Petitioner contends this instruction allowed the jury to consider evidence of the pawned diamond, which he contends was irrelevant since it could not be positively identified as having been stolen in the robbery, and the instruction allowed the jury to consider Detective McDonough's testimony that Petitioner waived his Miranda rights in connection to the prior crimes and thereby consider his admissions in connection to those crimes.  As set forth above, Petitioner has not shown that the pawn slip, the pawned diamond, or the prior convictions were irrelevant or inadmissible.  The Court concludes under a de novo review that Petitioner has not alleged that the jury instruction in this respect "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72.

Petitioner alleges in Claim 36 that the trial court erred in instructing the jury on circumstantial evidence.  (FAP [ECF No. 13] at 12; Supp. Travers [ECF No. 42] at 51.)  The argument Petitioner presents in support of this claim is incomprehensible (id.), and there is no error apparent in the record regarding the circumstantial evidence jury instructions given at his trial.  (RT 511-13.)  Based on a de novo review, the Court concludes that Petitioner has not alleged facts which establish that this jury instruction, "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72.

Petitioner alleges in Claim 37 that the trial court erred in instructing the jury on "crime." (FAP [ECF No. 13] at 12; Supp. Travers [ECF No. 42] at 52, 58.)  The argument Petitioner presents in support of this claim is incomprehensible (id.), and there is no error apparent in the record.  Based on a de novo review, the Court concludes this claim does not allege a federal due process violation.

Petitioner alleges in Claim 39 that the trial court erred in failing to instruct jury on presumption of innocence after the close of evidence but before their deliberations began.  (FAP [ECF No. 13] at 13; Supp. Travers [ECF No. 42] at 54.)  The jury did in fact receive such an instruction after the close of evidence and before they began deliberations.  (RT 509.)  Based on a de novo review, the Court concludes this claim does not allege a federal due process violation.

1    Finally, Petitioner alleges in Claim 40 that it was error to instruct the jury to consider all

2    of the evidence, because "the evidence received at trial was hearsay, inadmissible, improbable,

3    and factually incorrect." (FAP [ECF No. 13] at 13; Supp. Travers [ECF No. 42] at 55.)  As set

4    forth throughout this Report, Petitioner has not identified any improperly admitted evidence.

5    Based on a de novo review, the Court concludes that Petitioner has not shown this jury

6    instruction "so infected the entire trial that the resulting conviction violates due process."

7    <u>McGuire</u>, 502 U.S. at 72.

8    Accordingly, the Court concludes, based on a de novo review, that Petitioner's claims of

9    jury instruction error do not provide a basis for federal habeas relief.   The Court

10   **RECOMMENDS** habeas relief be **DENIED** as to Claims 33-34, 35(b), 36-37, 39-40 and 43.

11   **6.   Evidentiary Hearing**

12   Petitioner requests an evidentiary hearing. (Traverse [ECF No. 40] at 2.)  An evidentiary

13   hearing is not necessary where, as here, the federal claims can be denied on the basis of the state

14   court record, and where the petitioner's allegations, even if true, do not provide a basis for

15   habeas relief.  <u>Campbell v. Wood</u>, 18 F.3d 662, 679 (9th Cir. 1994).  The Court concludes that

16   an evidentiary hearing is neither necessary nor warranted to address Petitioner's claims.

17   **VI.**

18   **<u>CONCLUSION AND RECOMMENDATION</u>**

19   For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court

20   issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing

21   that judgement be entered denying the Petition.

22   **IT IS ORDERED** that no later than **<u>August 14, 2015</u>** any party to this action may file

23   written objections with the Court and serve a copy on all parties.  The document should be

24   captioned "Objections to Report and Recommendation."

25   **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

26   Court and served on all parties no later than **<u>August 24, 2015</u>**.  The parties are advised

27   that failure to file objections with the specified time may waive the right to raise those objections

28

14cv0560

1   on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998);

2   Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

3          **IT IS SO ORDERED.**

4

5   **DATED:  July 31, 2015**

6                                               _____

                                                **JILL L. BURKHARDT**

7                                               **United States Magistrate Judge**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28